## Commonwealth *v.* Clark, Appellant.

Argued January 19, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Sanford Kahn,* for appellant.

*David Richman,* Assistant District Attorney, with him *Milton M. Stein,* Assistant District Attorney, *James*

*D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, June 28, 1971:

Charles Clark here appeals from the denial of a motion for a discharge or new trial based upon the claim that a seven year delay between indictment and conviction deprived him of his right to a speedy trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. For reasons appearing below, we conclude that the record must be remanded for further proceedings on this claim.

In 1951 appellant was incarcerated in the Indiana State Reformatory, Pendleton, Indiana, serving a 10 to 25 year term of imprisonment for robbery. On October 10th of that year he approached the warden of that institution and voluntarily confessed to the commission of various crimes, including murder, in the Philadelphia area in March of 1951. These admissions were promptly transmitted to the appropriate Philadelphia authorities, and two Philadelphia police detectives soon visited the prison. Although appellant in his original statement to the warden referred to a killing on the outskirts of Philadelphia, he admitted to the detectives that he had murdered one Harry Miller.

On February 4, 1952, appellant was brought to Philadelphia where he gave a signed confession, confirming his earlier admissions. An indictment was returned in due course but without notice to appellant who had by that time been returned to Indiana to serve the balance of his prison term for robbery without so much as a preliminary hearing on the Pennsylvania murder charge.

Appellant was not again released to the custody of Pennsylvania authorities until October 14, 1958, and not finally tried on the Pennsylvania murder charge

until March 30, 1959. At trial he denied having killed Harry Miller and testified that his statements in 1951 and 1952 to the Indiana warden and to the Philadelphia detectives were with one exception all fabrications designed to secure his transfer away from a cellmate who had threatened to assault him sexually.[1] This explanation was apparently not believed by the jury, and appellant was found guilty of murder in the first degree and sentenced to life imprisonment.

No direct appeal was taken from this judgment of sentence, but in 1967 appellant filed a petition for relief pursuant to the Post Conviction Hearing Act[2] alleging among other things that he had been denied his right of appeal. This allegation was found to be meritorious, and appellant thereafter filed post-trial motions contending that he had been denied his right to a speedy trial, that his confession had been erroneously admitted at trial, and that the trial court had improperly restricted the cross-examination of one of the Commonwealth's witnesses. The hearing court rejected the latter two contentions but held that an evidentiary hearing was necessary in order to resolve the speedy trial claim and ordered a new trial to enable appellant to raise that issue in a pretrial hearing.

Following the denial of its motion for reconsideration, the Commonwealth appealed the order granting a new trial to this Court on the theory that appellant had waived his right to assert his speedy trial claim by his failure to raise the issue either at trial or in his Post Conviction Hearing Act petition. We rejected this waiver argument but sustained the Common-

---

[1] The one exception was a confession to the warden concerning a robbery in Norristown. Appellant reaffirmed the truth of this admission upon cross-examination at trial.

[2] Act of January 25, 1966, P. L. (1965) 1580, 19 P.S. §1180-1 et seq.

wealth's position that it was inappropriate to order a new trial merely to provide a forum for an evidentiary hearing. Accordingly, the order granting a new trial was vacated and the record remanded for further proceedings on appellant's claim of denial of speedy trial. See *Commonwealth v. Clark,* 439 Pa. 192, 266 A. 2d 741 (1970).

An evidentiary hearing was held on August 25, 1970. Based upon appellant's testimony at that hearing and upon the trial record, the hearing court concluded that the Commonwealth's delay in bringing appellant to trial was not unreasonable under all the circumstances and that the seven year delay between indictment and trial did not in any event prejudice appellant in defending against the charge. Reasoning from these conclusions, the court held that appellant had not been deprived of his Sixth Amendment right to speedy trial and denied his motion for a discharge or new trial. The instant appeal followed.

As the United States Supreme Court has only recently held the Sixth Amendment right to a speedy trial enforceable against the states through the Fourteenth Amendment, *Klopfer v. North Carolina,* 386 U.S. 213, 87 S. Ct. 988 (1967), many questions essential to the definition and implementation of the speedy trial guarantee are yet to be definitively resolved.[3] Because this is a currently emerging area of the law it is helpful to place the issues involved in this appeal in historical perspective.

Prior to *Klopfer* there existed a split of authority as to whether a state had an affirmative duty to seek

---

[3] For a comprehensive catalogue of the unresolved issues pertaining to the right to speedy trial, see *Dickey v. Florida,* 398 U.S. 30, 40, 90 S. Ct. 1564, 1569 (1970) (BRENNAN, J., concurring). Of course, even prior to *Klopfer,* the Commonwealth had a *state* constitutional duty to afford criminal defendants a "speedy public trial." Pa. Const. Art. I, §9.

to bring to trial an accused serving a prison term in another jurisdiction. The large majority of the decided cases held that there was no such duty, and the foremost rationale advanced in support of this traditional majority view rested upon a formalistic conception of sovereignty. In short, it was assumed that the prosecution of one incarcerated in another jurisdiction could be constitutionally deferred, "since the sovereign seeking to try the prisoner did not have the power and authority over the prisoner to bring him to trial. This rule applied even if the custodial sovereign agreed to allow the other sovereign to try their prisoner." *Lawrence v. Blackwell,* 298 F. Supp. 708, 712 (N.D. Ga. 1969). A "sovereign" it was argued, should not be compelled to request what need not be granted (temporary custody of the accused), thus exposing itself to the possible indignity of refusal. See, e.g., *Cooper v. Texas,* Tex. , , 400 S.W. 2d 890, 892 (1966) ; Note, Effective Guaranty of a Speedy Trial for Convicts in Other Jurisdictions, 77 Yale L. J. 767, 771 (1968). Aside from such formal concepts of power and authority, the sovereignty theory was also buttressed to a certain extent by the pragmatic consideration of historically complicated and confusing extradition procedures.

The delayed prosecution of those confined in another jurisdiction has also been justified upon the theory that such persons have fled the accusing jurisdiction, thus waiving their right to speedy trial, and on the ground that the state would have to bear substantial expenses in securing the temporary custody of the accused and transporting him to and from trial. See, e.g., *Dreadfulwater v. State,* 415 P. 2d 493 (Okla. Crim. App. 1966). Finally, it has been suggested that one of the real reasons for delaying prosecution of this class of defendants is convenience to the state: many an overworked prosecutor might welcome the chance to

postpone the trial of some cases. See Note, Detainers and the Correctional Process, 1966 Wash. U. L. Q. 417, 418-19.

These arguments in support of the majority rule were not persuasive when originally propounded and are even less persuasive today. As to the sovereignty theory it has been cogently observed that: ". . . the Uniform Criminal Extradition Act, now in force in all but six states, today provides for a safe and simple extradition procedure between states. Statutory and case law has similarly simplified the process of granting temporary custody between state and federal jurisdictions. These procedural reforms leave little force in an argument which elevates the small danger of a rebuff of one sovereign by another above the concrete evils which can result from denial of a speedy trial." Note, Effective Guaranty of a Speedy Trial for Convicts in Other Jurisdictions, supra at 772 (footnotes omitted). And as to the notion that those incarcerated in other jurisdictions have somehow waived their right to a speedy trial by fleeing to avoid prosecution, it is sufficient to note that the argument rests in large measure upon a fiction. Furthermore, even in those cases where an accused has actually fled to another state to avoid prosecution, there is scant reason to view this as a permanent waiver even after he is in the custody of that other state and his whereabouts known to the accusing jurisdiction.

Finally, the arguments from prosecutorial convenience and state financial economy are devoid of merit. It might be equally or even more "convenient" for a prosecutor to dispense with juries in criminal trials, but no one would seriously suggest that this would warrant the suspension of the constitutional right to trial by jury. In the same manner, little heed should be paid to any argument that would sacrifice the con-

stitutional right to a speedy trial merely to alleviate a prosecutor's congested schedule. Nor is it to be expected that the cost of temporary extradition will be substantial, for "[i]f an accused . . . is ultimately to be tried, the only *extra* cost to try him speedily is the cost of his return trip to the prison." *State v. Byrne,* 20 Wis. 2d 504, 512, 123 N.W. 2d 305, 309-10 (1963) (emphasis added). Moreover, it is abundantly clear that constitutional rights are not to be measured in dollars and cents. Consider, for example, the much more significant expenses incurred by the states in complying with the constitutional mandate of *Gideon v. Wainwright,* 372 U.S. 335, 83 S. Ct. 792 (1963), and its progeny dealing with the right of indigent defendants to free counsel at various critical stages of the criminal prosecution.[4]

Against this background it was not surprising that the United States Supreme Court repudiated the traditional majority view and held that a state does have an affirmative duty to make a good faith and diligent effort to gain custody of one serving a prison term in another jurisdiction for the purpose of affording him a speedy trial. *Smith v. Hooey,* 393 U.S. 374, 89 S. Ct. 575 (1969) ; *Dickey v. Florida,* 398 U.S. 30, 90 S. Ct. 1564 (1970).[5] Thus, the initial question in this appeal is whether the Commonwealth fulfilled this duty

---

[4] In the same vein, consider the financial implications of *In re Gault,* 387 U.S. 1, 87 S. Ct. 1428 (1967), and *Griffin v. Illinois,* 351 U.S. 12, 76 S. Ct. 585 (1956).

[5] Even before the Supreme Court's definitive pronouncements on this issue, a growing number of jurisdictions had already recognized the fundamental deficiencies of the once unanimous majority rule and adopted instead a rule similar to that enunciated in *Smith* and *Dickey.* See, e.g., *Barker v. Municipal Court,* 64 Cal. 2d 806, 415 P. 2d 809, 51 Cal. Rptr. 921 (1966) ; *Commonwealth v. McGrath,* 348 Mass. 748, 205 N.E. 2d 710 (1965) ; *People v. Bryarly,* 23 Ill. 2d 313, 178 N.E. 2d 326 (1961).

in waiting to try appellant seven years after his indictment.

It is apparent on this record that no effort, diligent or otherwise, was made to bring appellant to trial in Pennsylvania between 1952 and 1959. The Commonwealth concedes as much in this appeal but argues that its conduct was "reasonable" in light of appellant's failure to have requested a speedier trial and in light of the fact that the Commonwealth's constitutional duty to bring him to trial was far from clear prior to the United States Supreme Court's decision in *Smith v. Hooey,* supra.

In both *Smith v. Hooey* and *Dickey v. Florida,* supra, the respective defendants had unsuccessfully demanded trial. We do not, however, believe that the thrust of these decisions is limited to that narrow situation. Although there is considerable case law supporting the necessity of a demand for trial as a prerequisite to the successful assertion of a speedy trial claim, see, e.g., *United States v. Lustman,* 258 F. 2d 475 (2d Cir.), cert. denied, 358 U.S. 880, 79 S. Ct. 118 (1958) ; *Cabrera v. Smith,* 308 F. Supp. 389, 393 (D. Vt. 1969), the so-called demand rule is highly suspect.[6] As noted in Mr. Justice BRENNAN's concurring opinion in *Dickey* joined in by Mr. Justice MARSHALL:

"The view that an accused loses his right to a speedy trial by silence or inaction is open to question on at least three grounds. First, it rests on what may be an unrealistic understanding of the effect of delay. One court in explaining the 'demand' rule stated that it 'is based on the almost universal experience that delay in criminal cases is welcomed by defendants as it usually operates in their favor.' . . . It is true that

---

[6] For a general discussion of the "demand rule", see Note, The Right to a Speedy Criminal Trial, 57 Colum. L. Rev. 846, 852-55 (1957).

delay may be welcomed by an accused, especially if he greatly fears the possible consequences of his trial. . . . But an accused may just as easily object to delay for its prolongation of the time in which he must live in uncertainty, carrying the emotional and financial burdens of accusation, and possessing the conditioned freedom of a potential felon. Moreover, the passage of time may threaten the ability of both the defendant and the government to prepare and present a complete case; in this regard, delay does not inherently benefit the accused any more than it does the prosecution.

"Second, the equation of silence or inaction with waiver is a fiction that has been categorically rejected by this Court when other fundamental rights are at stake. Over thirty years ago in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461 (1938), we defined 'waiver' as 'an intentional relinquishment or abandonment of a known right or privilege.' We have made clear that courts should 'indulge every reasonable presumption against waiver,' Aetna Ins. Co. v. Kennedy to use of Bogash, 301 U.S. 389, 393, 57 S. Ct. 809, 812, 81 L. Ed. 1177 (1937), and that they should 'not presume acquiescence in the loss of fundamental rights.' Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U.S. 292, 307, 57 S. Ct. 724, 731, 81 L. Ed. 1093 (1937). In Klopfer, supra, 386 U.S. at 223, 87 S. Ct. at 993, we held that the right to a speedy trial 'is as fundamental as any of the rights secured by the Sixth Amendment.' It is a safeguard of the interests of both the accused and the community as a whole. Thus, can it be that affirmative action by an accused is required to *preserve*—rather than to *waive*—the right?

"Third, it is possible that the implication of waiver from silence or inaction misallocates the burden of ensuring a speedy trial. The accused has no duty to

bring on his trial. He is presumed innocent until proved guilty; arguably, he should be presumed to wish to exercise his right to be tried quickly, unless he affirmatively accepts delay. The government, on the other hand, would seem to have a responsibility to get on with the prosecution, both out of fairness to the accused and to protect the community interests in a speedy trial. Judge WEINFELD of the District Court for the Southern District of New York has observed, 'I do not conceive it to be the duty of a defendant to press that he be prosecuted upon an indictment under penalty of waiving his right to a speedy trial if he fails to do so. It is the duty of the public prosecutor, not only to prosecute those charged with crime, but also to observe the constitutional mandate guaranteeing a speedy trial. If a prosecutor fails to do so, the defendant cannot be held to have waived his constitutional right to a speedy trial.' United States v. Dillon, 183 F. Supp. 541, 543 (1960)." Dickey v. Florida, supra, 398 U.S. at 49-50, 90 S. Ct. at 1574-75 (footnote and citations omitted).[7]

These shortcomings of the demand rule are most disturbing, but we need not face them in this case, for it is self-evident that such a rule cannot be applicable to one who is unaware of the pending charges against him. As was recently stated by the United States Court of Appeals for the Fourth Circuit: "[T]here are several well-recognized exceptions to this doctrine. In Hill v. United States, 310 F. 2d 601, 603 (4th Cir. 1962), this court listed as illustrative of these exceptions situations 'where the defendant had no knowledge of the pending charge' . . . and 'where defendant was powerless to assert his right because of imprisonment, ignorance and lack of legal advice' . . . ." Pitts v.

---

[7] Accord, Note, The Lagging Right to a Speedy Trial, 51 Va. L. Rev. 1587, 1601-10 (1965).

*North Carolina,* 395 F. 2d 182, 187 (4th Cir. 1968) (citations omitted). Appellant falls squarely within these exceptions. During his years of imprisonment in Indiana he was *never* informed of the murder charge pending against him in Pennsylvania and was without the benefit of the advice and assistance of counsel. Even assuming arguendo that the demand rule has any general merit, an uncounseled failure to demand a trial upon unknown charges can scarcely be viewed as a knowing and intelligent waiver of Sixth Amendment rights.

The Commonwealth appears to agree with this position but argues that by the same token it would be "exceedingly harsh and unreasonable to fault the Commonwealth for having failed to perform a constitutional duty in 1952 unknown until 1968." The short answer to this is that this Court is concerned not with finding fault with the Commonwealth but rather with ensuring constitutionally fair trials, and for this reason we have held *Smith v. Hooey* and *Dickey v. Florida* to be retroactive. See *Commonwealth v. Ditzler,* 443 Pa. 73, 277 A. 2d 336 (1971).[8]

Moreover, even if we were to accede to the Commonwealth's view that state action prior to *Smith* and *Dickey* should be measured in less strict and more general terms of "reasonableness", the Commonwealth's conduct in the instant case would nevertheless fail to pass muster. As set out above, two of the traditional justifications for a state's failure to attempt to try persons confined in other jurisdictions were the accusing state's lack of power and authority to gain custody

---

[8] Accord, *Becker v. Nebraska,* 310 F. Supp. 1275, 1279 (D. Neb. 1970) ; but see *Fossey v. Indiana,*      Ind.    , 258 N.E. 2d 616 (1970). It is also noteworthy that the Supreme Court in *Dickey* effectively accorded retroactive treatment to *Smith v. Hooey* by applying the *Smith* rule to state conduct occurring *prior* to *Smith.*

of such persons and a desire to avoid the expense of temporary extradition for trial. But Pennsylvania did in fact gain custody of appellant in the early part of 1952 when it had him brought to Philadelphia to execute a signed confession. Thus, the Commonwealth can scarcely be heard to complain that it lacked the power and authority to afford appellant a speedy trial. For the same reason, there can be no merit in any argument that the seven year postponement of appellant's trial was rendered reasonable by a desire to save the state the monetary costs of temporary extradition.

Even though appellant languished in Indiana custody for seven years following his indictment without any effort having been made to try him any sooner, he is still not entitled to any relief unless he was prejudiced by the delay.

The Sixth Amendment's speedy trial guarantee was designed to serve a three-fold function: "[1] to prevent undue and oppressive incarceration prior to trial, [2] to minimize anxiety and concern accompanying public accusation and [3] to limit the possibilities that long delay will impair the ability of the accused to defend himself." *United States v. Ewell*, 383 U.S. 116, 120, 86 S. Ct. 773, 776 (1966). The dangers of these harms "are both aggravated and compounded in the case of an accused who is imprisoned by another jurisdiction." *Smith v. Hooey*, supra, 393 U.S. at 378, 89 S. Ct. at 577. The oppressiveness of the incarceration of such a person is likely to manifest itself in the irretrievable loss of the possibility of receiving a sentence partially concurrent with the one he is presently serving and in the increased duration of his present imprisonment as well as in the worsened conditions of that imprisonment. And the anxiety and concern suffered by such a person is likely to be reflected in the retardation of his efforts toward rehabilitation. Final-

ly, the erosive effects of long delay upon an accused's ability to defend himself are increased when the accused is the prisoner of another jurisdiction. His opportunities to confer with potential defense witnesses, to keep track of their whereabouts, and to exert his own investigative efforts are all severely restricted.

In the instant case, however, there is no suggestion that appellant suffered any undue or oppressive incarceration as a result of the postponed trial of the Pennsylvania murder charge. The conditions of his Indiana imprisonment were not adversely affected by the outstanding Pennsylvania charge, and in light of his present sentence of life imprisonment the total period of his incarceration was not lengthened by reason of the delay in bringing him to trial. Furthermore, as appellant was unaware of the Pennsylvania indictment he cannot possibly have suffered any anxiety, emotional distress or impediment to rehabilitation as a result of that charge. We cannot, however, so lightly dismiss appellant's claim that the seven year delay of his trial impaired his ability to defend himself.

At his trial in 1959, appellant offered no alibi defense. His two court-appointed attorneys had visited him in prison after his return to Pennsylvania in 1958 in order to discuss the preparation of his defense. According to appellant, when they asked him to recall his movements and whereabouts on March 3, 1951, the approximate date of the murder, he responded that he thought he had been in Baltimore, Maryland at the time but could not remember the names or addresses of any potential witnesses.

In addition to the loss of a possible alibi defense, appellant claims that his opportunity to convince the jury of the falsity of his confession was eroded by the passage of time. At trial appellant testified that in the weeks and months following his return to Indiana

he recanted and repudiated his confession to numerous persons at the Indiana State Reformatory. He supplied his attorneys with the names of five such individuals, including a prison psychiatrist, a chaplain and a deputy warden. None of these persons appeared at trial, and appellant testified that the reason for their absence lay in the fact that when his lawyers attempted to contact them they were no longer at the Indiana institution and could not be located.

Finally, appellant asserts that the seven year pretrial delay further hindered his ability to demonstrate the untruthfulness of his confession by causing the loss of an opportunity to prove the falsity of a specific portion of the confession wherein he stated that he had pawned a ring owned by the victim. Appellant testified that the ring mentioned in the confession actually belonged to him, not the victim, but that this fact could not be verified inasmuch as the ring had been resold by the time his attorneys visited the pawn shop.

No other witnesses appeared at the evidentiary hearing to corroborate appellant's claims of prejudice, and the Commonwealth for its part offered no evidence on the issue. The hearing court held appellant's own testimony to be unworthy of belief and found that the delay of his trial did not impair his ability to defend himself. In so concluding, the court must have necessarily assumed that appellant bore the burden of affirmatively demonstrating prejudice. On this record, we think that this allocation of the burden of proof was erroneous.

The role of prejudice in speedy trial determinations is the subject of widespread difference of opinion.[9] At one extreme is the view that its existence must always be shown in order for an accused to claim the denial

---

[9] See generally Note, The Right to a Speedy Trial, 20 Stan. L. Rev. 476, 493 (1968).

of his right to a speedy trial. See, e.g., *United States v. Jackson*, 369 F. 2d 936, 939 (4th Cir. 1966); at the other extreme is the view that "a showing of prejudice is not required when a criminal defendant is asserting a constitutional right under the Sixth Amendment." *United States v. Lustman*, 258 F. 2d 475, 478 (2d Cir. 1958). In between are at least three intermediate positions. Some jurisdictions appear to hold that there is a conclusive presumption of prejudice but only after the passage of a substantial period of time. See, e.g., *Commonwealth v. Green*, 353 Mass. 687, 234 N.E. 2d 534 (1968); *Barker v. Municipal Court*, 51 Cal. Rptr. 921, 415 P. 2d 809 (1966). Still other jurisdictions embrace the position that the burden of proving prejudice is initially upon the defendant but that a rebuttable presumption of prejudice arises where there has been a substantial delay. See, e.g., *Smith v. United States*, 418 F. 2d 1120 (D.C. Cir. 1969) (one year); *Pitts v. North Carolina*, 395 F. 2d 182 (4th Cir. 1968) (sixteen years); *United States v. Blanca Perez*, 310 F. Supp. 550 (S.D. N.Y. 1970) (four years); *Wilson v. State*, 8 Md. App. 299 (1969) (seventeen months). Finally, it has been suggested that the proper rule is to require the government to negate the presence of prejudice whenever a defendant establishes a "prima facie" case of prejudice. *Smith v. Hooey*, supra, 393 U.S. at 384, 89 S. Ct. at 580 (separate opinion of HARLAN, J.).

In assessing the relative merit of this welter of different doctrines, we note initially that the categorical rule requiring a defendant to prove actual prejudice in all circumstances is unsupportable. While such a rule might have some appeal with regard to general notions of due process, the express language of the Sixth Amendment is quite explicit: every criminal defendant enjoys an unequivocal and unconditional right to a speedy trial.

"With the exception of the due process clause, no procedural safeguard in the Bill of Rights designed to ensure the reliability of the guilt-determination process other than the right to a speedy trial . . . [has been held to require] a defendant to show actual prejudice in order to establish a violation of that safeguard." Note, The Right to a Speedy Trial, 20 Stan. L. Rev. 476, 493-94 (1968). It is most difficult to reconcile this anomalous situation with the Supreme Court's holding in *Klopfer,* supra, that the speedy trial guarantee is "as fundamental as any of the rights secured by the Sixth Amendment." 386 U.S. at 223, 87 S. Ct. at 993. Furthermore, any requirement that an accused prove actual prejudice would also directly conflict with the general rule that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). In sum, it is most difficult to understand why a claimed violation of the "fundamental" right to a speedy trial should be relegated to an inferior status and accorded much less favorable treatment than is given to claimed violations of other constitutional rights.

In resolving the present appeal, however, it is not necessary to decide whether speedy trial claims should in all circumstances be free of any necessity of demonstrating prejudice and subject only to a harmless error rule. Here appellant suffered a substantial seven year delay and although appellant's evidence of prejudice is far from overwhelming, his uncontradicted testimony raises a prima facie showing of resultant harm. At least in such circumstances the Commonwealth should bear the burden of affirmatively proving the absence of prejudice, and we so hold.

However, as this particular issue is one of first impression, we realize that the Commonwealth might

have assumed in good faith that it was incumbent upon appellant to demonstrate prejudice in order to prevail upon his speedy trial claim. For this reason we will again remand this record to afford the Commonwealth an opportunity to meet its burden of proof. Cf. *Commonwealth v. Wilson,* 430 Pa. 1, 241 A. 2d 760 (1968). If upon remand the Commonwealth satisfies its burden of proof, the hearing court shall reinstate appellant's sentence and enter an appropriate order denying relief; otherwise, the court shall order appellant's discharge.

The judgment of sentence is vacated and the record remanded for further proceedings consistent with this opinion.

Mr. Justice EAGEN and Mr. Justice POMEROY concur in the result.

Mr. Justice JONES and Mr. Justice BARBIERI dissent.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.