329 A.2d 258
**COMMONWEALTH of Pennsylvania**

v.

**Paul D. WARE, Appellant.**

Supreme Court of Pennsylvania.
Argued April 30, 1974.
Decided Nov. 20, 1974.

336

338

340

J. Charles Short, Daniel M. Rendine, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Richard A. Sprague, 1st Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief Appeals Div., Mark Sendrow, Asst. Dist. Atty., Abraham J. Gafni, Deputy Dist. Atty., for Law, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant Paul D. Ware was convicted by a jury of the 1963 murder of Miss Florence Grauley, age 83. After denial of appellant's post-trial motions, he was sentenced to life imprisonment. This appeal followed.[1] Appellant raises a variety of claims, all of which we find to be without merit. We affirm.

Appellant first contends that he has been denied a speedy trial in violation of the United States[2] and Pennsylvania[3] Constitutions. Resolution of this claim requires consideration of the long history of this case.

Ware was arrested on September 27, 1963. He confessed to the murder of Miss Grauley and other crimes on October 3 and was indicted by the grand jury on December 12. However he was declared incompetent to stand trial and was accordingly committed on January 8, 1964, to Farview State Hospital.

He was discharged from Farview on July 19, 1967, having been found competent. On April 16, 1968, appellant filed a motion to suppress his confession as obtained in violation of his constitutional rights. After a hearing, the court suppressed the confession on May 23, 1968, on

1. Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1974).

2. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . .." U.S.Const. amend. VI.
 The right to a speedy trial exists in state prosecutions by virtue of the Fourteenth Amendment, U.S.Const. amend. XIV, § 1. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

3. "In all criminal prosecutions [by indictment or information] the accused hath a right to . . . a speedy public trial . . .." Pa.Const. art. I, § 9, P.S.

the ground that Ware had not received *Miranda* [4] warnings.

The Commonwealth determined that, without his confession, it had insufficient evidence to proceed to trial. Consequently, it moved on December 12, 1968, for a nolle prosequi of the indictment, which was granted with the consent of appellant's counsel.

The decision of the United States Supreme Court in *Jenkins v. Delaware,* 395 U.S. 213, 89 S.Ct. 1677, 23 L. Ed.2d 253 (1969), caused the Commonwealth to believe that Ware's confession might be admissible despite the absence of *Miranda* warnings. Accordingly, on August 11, 1969, it petitioned for removal of the nol pros order and vacation of the suppression order. Removal of the nol pros was granted, over the objection of appellant, on December 11, 1969, and the suppression order was vacated on June 19, 1970.

On June 25, 1970, a new suppression hearing was held, and appellant's motion to suppress was denied on November 13, 1970. Upon the joint petition of appellant and the Commonwealth, the court certified its order and we permitted an appeal. On December 20, 1971, we reversed the denial of the motion to suppress and held that appellant's confession was inadmissible. *Commonwealth v. Ware,* 446 Pa. 52, 284 A.2d 700 (1971). The Commonwealth petitioned the Supreme Court of the United States for a writ of certiorari, which was granted on March 20, 1972. *Pennsylvania v. Ware,* 405 U.S. 987, 92 S.Ct. 1254, 31 L.Ed.2d 453 (1972). However, on April 24, 1972, the writ of certiorari was vacated and the petition denied, "it appearing that the judgment below rests on an adequate state ground." *Pennsylvania v. Ware,* 406 U.S. 910, 92 S.Ct. 1606, 31 L.Ed.2d 821 (1972).

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Thereafter, on July 3, 1972, appellant filed an application for dismissal under Pa.R.Crim.P. 316, contending that he had been deprived of his right to a speedy trial. The application was denied on September 26, 1972. Trial finally began on June 21, 1973, 117 months after his arrest.

Though the right to a speedy trial is "one of the most basic rights preserved by our Constitution," *Klopfer v. North Carolina,* 386 U.S. 213, 226, 87 S.Ct. 988, 995, 18 L.Ed.2d 1 (1967),[5] it is also "a more vague concept than other procedural rights. It is . . . impossible to determine with precision when the right has been denied." *Barker v. Wingo,* 407 U.S. 514, 521, 92 S. Ct. 2182, 2187, 33 L.Ed.2d 101 (1972).[6] Vagueness results at least in part from the incompatibility of haste with the procedural safeguards designed to effectuate other rights of the accused and to insure that he receives due process.

"[I]n large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."

*United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). Thus, it has long been recognized that

"The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances."

5. See also *Commonwealth ex rel. Smith v. Patterson,* 409 Pa. 500, 502, 187 A.2d 278, 279 (1963) (dictum).

6. No constitutional impediment exists to a rule which, made in the exercise of a court's supervisory powers, creates a precise test. *Barker v. Wingo,* 407 U.S. 514, 530 n. 29, 92 S.Ct. 2182, 2192 n. 29, 33 L.Ed.2d 101 (1972). See *Commonwealth v. Hamilton,* 449 Pa. 297, 302–309, 297 A.2d 127, 130–133 (1972); Pa.R. Crim.P. 1100.

*Beavers v. Haubert,* 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950 (1905).

Therefore, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case . . . ." *Barker v. Wingo,* supra, at 522, 92 S.Ct. at 2188. We are required to "engage in a difficult and sensitive balancing process," id. at 533, 92 S.Ct. at 2193, "in which the conduct of both the prosecution and the defendant are weighed." Id. at 530, 92 S.Ct. at 2192 (footnote omitted). The factors we must consider in this balancing process are "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. (footnote omitted).[7] A balancing of these factors leads us to conclude that appellant was not denied his right to a speedy trial.

■■ Length of delay serves as a triggering mechanism. "When a delay is so extensive that a court considers it presumptively prejudicial, inquiry into the three other factors is necessary." *Commonwealth v. Williams,* 457 Pa. 502, 507, 327 A.2d 15, 17 (1974); see generally *Barker v. Wingo,* supra, at 530, 92 S.Ct. at 2192. It can hardly be doubted that a delay of 117 months is presumptively prejudicial. See *Commonwealth v. Williams,* supra; *Commonwealth v. Hamilton,* 449 Pa. 297, 299–300, 297 A.2d 127, 128 (1972).

■ The tangled nature of these proceedings renders assignment of reasons for the delay a complex task. The longest period, 43 months, represents the time during which appellant was incompetent to stand trial. The Commonwealth bears no responsibility for this delay, for the Constitution forbids the trial of a defendant who is

7. See *Commonwealth v. Williams,* 457 Pa. 502, 507, 327 A.2d 15, 17 (1974); *Commonwealth v. Jones,* 450 Pa. 442, 447, 299 A.2d 288, 291 (1973); *Commonwealth v. Hamilton,* supra n. 6, at 299, 297 A.2d at 128.

mentally incompetent to participate in his defense.[8] This period of delay, necessary for the protection of appellant's right to a fair trial, is obviously justifiable.[9]

 The second longest period is the time consumed by pretrial proceedings, including motions and an interlocutory appeal, a total of 33 months. It was intimated by the court below that assessment of the delay resulting from pretrial proceedings requires a determination of the moving party and, if the defendant was the moving party, whether his action was taken to vindicate his constitutional rights. *Barker v. Wingo,* supra, teaches that the balancing test is not a mechanical process of parsing the pleadings.[10] We believe that a reasonable amount of time consumed by the disposition of motions and interlocutory appeals not made for purposes of delay, regardless of who is the moving party, is justifiable delay. See ABA Project on Standards for Criminal Justice, Standards Relating to Speedy Trial § 2.3(a) (Approved Draft, 1968) ; see also *Blunt v. United States,* 131 U.S.App.D.C. 306, 404 F.2d 1283, 1286 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 22 L.Ed.2d 221 (1969).

8. *Commonwealth v. Kennedy,* 451 Pa. 483, 487–489, 305 A.2d 890, 892–893 (1973).

9. ABA Project on Standards for Criminal Justice, Standards Relating to Speedy Trial § 2.3(a) (Approved Draft, 1968); see *United States v. Canty,* 152 U.S.App.D.C. 103, 469 F.2d 114, 118 (1972); Note, The Right to a Speedy Criminal Trial, 57 Col.L.Rev. 846, 850 (1957); cf. *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966); *Blunt v. United States,* 131 U.S. App.D.C. 306, 404 F.2d 1283, 1287 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 22 L.Ed.2d 221 (1969).

10. "[D]ifferent weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."
*Barker v. Wingo,* supra n. 6, at 531, 92 S.Ct. at 2192 (footnote omitted).

 Another period of delay, 12 months, was caused by the nol pros sought by the Commonwealth. In the particular circumstances of this case, we do not think the delay unjustifiable. See ABA Project on Standards for Criminal Justice, Standards Relating to Speedy Trial § 2.3(f) (Approved Draft, 1968). Because appellant's counsel consented to the nol pros,[11] this is not a case of "the indefinite postponement of trial over the objection of the accused . . . ." *Commonwealth v. Leaming,* 442 Pa. 223, 227, 275 A.2d 43, 45 (1971) ; see *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1, (1967) ; *Commonwealth v. Gant,* 213 Pa.Super. 427, 249 A.2d 845 (1968). Two other short periods of delay are clearly excusable. Two months is a reasonable time for action by the grand jury. One month, certainly a reasonable period, was consumed in proceedings for appellant's commitment to Farview.

 Thus, 91 months have been accounted for. The remaining 26 months remain unexplained and unexcused. However, consideration of the other factors of the *Barker* test leads us to conclude that appellant's right to a speedy trial has not been violated.

First, there is nothing in the record indicating that appellant was prejudiced [12] in his defense by the delay. He has suffered the inherent prejudice of long pretrial incarceration.[13] But we are unable to conclude that he has suffered any impairment of his defense, which is the most serious type of prejudice

11. Cf. ABA Standards, supra n. 9, § 2.3(c).

12. "Prejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. . . . : (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to lmit the possibility that the defense will be impaired." *Barker v. Wingo,* supra n. 6, 407 U.S. at 532, 92 S.Ct. at 2193 (footnote omitted).

13. See *Commonwealth v. Williams,* supra n. 7, at 507, 327 A.2d at 17.

"because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past."

*Barker v. Wingo,* supra, at 532, 92 S.Ct. at 2193.

There is here not the slightest hint that appellant's defense has been impaired by delay, no claims of dead, forgetful, or unavailable witnesses.[14] Thus, this case differs markedly from those where specific impairment of the defense was a factor leading to a conclusion that the right to a speedy trial has been violated: *Dickey v. Florida,* 398 U.S. 30, 38, 90 S.Ct. 1564, 1569, 26 L.Ed.2d 26 (1970) (deaths of two witnesses, unavailability of a witness, loss of police records); *Commonwealth v. Williams,* 457 Pa. 502, 507, 327 A.2d 15, 18 (1974) (loss of memory by a witness, death of a witness, and unavailability of two witnesses); *Commonwealth v. Hamilton,* 449 Pa. 297, 301, 297 A.2d 127, 129 (1972) (death of a witness); *Commonwealth v. Clark,* 443 Pa. 318, 331–332, 279 A.2d 41, 48–49 (1971) (defendant's loss of memory, unavailability of five witnesses, loss of physical evidence).

More importantly, the record demonstrates that appellant did not want a speedy trial. It is true that he objected to the removal of the nol pros on the ground that trial at that time would violate his speedy trial right and twice moved to dismiss on the same ground, in July, 1972, and at trial. However, he never demanded an immediate trial; see *Barker v. Wingo,* supra, at 535, 92 S. Ct. at 2194.[15] His counsel's consent to the Common-

---

14. See *Barker v. Wingo,* supra n. 6, at 534, 92 S.Ct. at 2194; see also *United States v. Ewell,* supra n. 9, at 122, 86 S.Ct. at 777.

15. With appellant's failure to demand a speedy trial, compare the demands of the defendants in *Dickey v. Florida,* 398 U.S. 30, 32–33, 37, 90 S.Ct. 1564, 1566–1568, 26 L.Ed.2d 26 (1970); *Smith v. Hooey,* 393 U.S. 374, 375, 383, 89 S.Ct. 575, 579, 21 L.Ed.2d 607

wealth's petition to nol pros contrasts sharply with the demands for a speedy trial made by the defendants in *Klopfer v. North Carolina,* supra; *Commonwealth v. Leaming,* supra; and *Commonwealth v. Gant,* supra. We conclude, as did the Supreme Court in *Barker v. Wingo,* supra, that

> "we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial."

407 U.S. at 536, 92 S.Ct. at 2195.[16]

In light of the absence of specific prejudice and appellant's failure to demand a speedy trial, we conclude that the balance of the relevant factors indicates appellant has not been denied his right to a speedy trial.

Appellant's next assignments of error relate to the issues of testimonial competency. At trial the Commonwealth relied primarily on admissions appellant made while he was an inmate at the Farview State Hospital. Three witnesses who had also been Farview inmates testified to hearing appellant's admissions. John Wesley Chase [17] and Clarence Marshall [18] testified that Ware ad-

---

(1969); *Klopfer v. North Carolina,* supra n. 2, at 214, 218, 87 S. Ct. at 989, 991; *Commonwealth v. Ditzler,* 443 Pa. 73, 75, 277 A. 2d 336, 337 (1971); *Commonwealth v. Leaming,* 442 Pa. 223, 225, 227, 275 A.2d 43, 44, 45 (1971); *Commonwealth v. Gant,* 213 Pa. Super. 427, 429, 249 A.2d 845, 846 (1968).

**16.** See also *Commonwealth v. Jones,* supra n. 7, at 448, 299 A.2d at 292.

**17.** Chase testified as follows:
"Q. What did [Ware] tell you now?
"A. He was in for house burglary, and I asked him how you go about that, and he said, 'Well, I dress real clean and I goes up like I'm the paper boy, the mailman,' and I particularly asked him about this one case that we all know about, the lady in the flowered dress, because we had the paper . . ..
A newspaper with Paul Ware's case in it and his name.
"Q. Now tell us about the paper and what you told Mr. Ware and what he said to you?

**18.** See Note 18 on page 351.

mitted burglarizing the home of Miss Grauley and murdering her. Edward Whelan reported overhearing a conversation in which Ware stated that "he had a mission in life to eliminate or destroy elderly white persons."

Appellant's argument is two-fold. First, he contends that Chase, Marshall, and Whelan were mentally incompetent, and thus should not have been permitted to testify. Second, he contends he was mentally incompetent at the time he made the incriminating statements, which accordingly should not have been admitted into evidence. We disagree on both counts.

In general, the testimony of any person, regardless of his mental condition, is competent evidence unless it contributes nothing whatever because he is

> "A. Well, I asked Paul Ware was he the same Paul Ware that pushed the lady down the steps and beat her with a chair. He said yes.
> "Q. What else, if anything, did he say?
> "A. So I asked him why did he do it. He said, 'Well, I was robbing, I was taking some money out of her pocketbook,' and I asked him, an old lady like that, why did he do that, and he said he don't like no people, he don't like old people, and he don't like no white folks at all."

18. Marshall testified as follows:
> "Q. Did [Ware] have occasion to talk to you about any specific incident?
> "A. He did.
> "Q. Very briefly, if you can recall what was said, what the conversation was, tell the jury what was said?
> "A. Well, Paul Ware mentioned a case in reference to an old lady that he had pushed down the stairs and strangled her, or either killed her, you know, the case in relation to that.
> "Q. Did he say where that case took place?
> "A. He said the case took place in North Philadelphia.
>
> . . . . . . . . . . .
>
> "Q. What, if anything, did he say in addition to what you have told us already?
> "A. He told me his intention was to, you know, rob, go there to rob, you know, the person that was living at the place, but he ran up on the old lady and so he either pushed her or threw her down the steps, you know."

wholly untrustworthy.[19] Incompetency does not follow from the fact that the witness is insane or mentally ill.[20] "The question being whether the person is trustworthy as a witness, the law now asks whether in each case the derangement or defect is such as to make the person highly untrustworthy as a witness; it no longer excludes absolutely." 2 J. Wigmore, Law of Evidence § 492, at 584 (3d ed. 1940).

The mental competency of every witness is presumed; the burden of proof of incompetency rests on the party opposing the witness.[21] However,

> "the fact that the witness is, at the time of testifying, or was shortly beforehand, a lawful inmate of an asylum for mental disease or defect, or an adjudged lunatic or defective, makes it necessary that his capacity should be examined into and an express finding appear."

**19.** 2 J. Wigmore, Law of Evidence § 492, at 584–85 (3d ed. 1940); McCormick's Handbook of the Law of Evidence § 62, at 140 (2d ed. E. Cleary 1972); Weihofen, Testimonial Competence and Credibility, 34 Geo.Wash.L.Rev. 53, 57 (1965).

The Act of May 23, 1887, P.L. 158, § 1, 19 P.S. § 681 (1964), provides, with exceptions not here relevant, that ". . . all persons shall be fully competent witnesses in any criminal proceeding before any tribunal." However,

> "Despite the language of the Act, it is apparent that in Pennsylvania, a witness' inability to tell the truth has always been cause to render him incompetent to testify. The Act of 1887 . . . has been held to deal solely with the competency of interested, as distinguished from disinterested witnesses, despite its apparently broader language."

Commonwealth v. Collins, 436 Pa. 114, 123, 259 A.2d 160, 164 (1969) (Opinion of three Justices); see also 2 G. Henry, Pennsylvania Evidence § 762, at 189 (1953).

**20.** Commonwealth v. Kosh, 305 Pa. 146, 156, 157 A. 479, 482 (1931); Commonwealth v. Loomis, 270 Pa. 254, 258, 113 A. 428, 429 (1921); Wigmore, supra n. 19, at 586; McCormick, supra n. 19, at 140; Weihofen, supra n. 19, at 57.

**21.** Commonwealth v. Collins, supra n. 19, at 124, 259 A.2d at 165; Commonwealth v. Kosh, supra n. 20, at 155, 157 A.2d at 482; Wigmore, supra n. 19, at 588; Weihofen, supra n. 19, at 65.

2 J. Wigmore, Evidence § 497, at 589 (3d ed. 1940) ; see District of Columbia's Appeal, 343 Pa. 65, 72, 21 A.2d 883, 887 (1941).

The standard of testimonial competency is carefully formulated to exclude factors extraneous to trustworthiness:

> "The general rule is that a lunatic or a person affected with insanity is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue . . . ."

*Commonwealth v. Kosh*, 305 Pa. 146, 156, 157 A. 479, 482 (1931).[22]

The core of the competency test is ability to give "a correct account of the matters which he has seen or heard." [23] Capacity to give a correct account must be analyzed in terms of the constituent elements of testimonial trustworthiness, perception, memory, and com-

---

**22.** Accord: *Commonwealth v. Loomis*, supra n. 20, at 258, 113 A. at 429; *Dulnikowski v. Stanziano*, 195 Pa.Super. 508, 510, 172 A. 2d 182, 183 (1961); *District of Columbia v. Arms*, 107 U.S. 519, 521–522, 2 S.Ct. 840, 842, 27 L.Ed. 618 (1883); *People v. Rensing*, 14 N.Y.2d 210, 213, 250 N.Y.S.2d 401, 403, 199 N.E.2d 489, 490 (1964).

**23.** Two other factors are noteworthy. The oath element "is sometimes phrased in language as a requirement that the witness must have intelligence enough 'to understand the nature and obligation of an oath.' This requirement is manifestly inappropriate. It confounds a religious standard with a mental standard, and if literally applied the most intelligent witness could hardly meet the standard, much less . . . an insane person." McCormick, supra n. 19, at 140 (footnote omitted). The test is better formulated "whether he feels a duty to tell the truth." Id.
Second, it is evident from *Kosh* that capacity must be measured "in reference to the questions at issue." For "the inquiry is always as to the relation of the derangement or defect to the subject to be testified about. If on this subject no aberration appears, the person is acceptable, however untrustworthy on other subjects . . . ." *Wigmore*, supra n. 19, at 586 (emphasis omitted). See also *Commonwealth v. Kosh*, supra n. 20, at 158, 157 A. at 482–483; *Weihofen*, supra n. 19, at 58.

munication;[24] "[i]f the inquiry is to deal with the relation of the derangement or defect of each person to his actual trustworthiness, it seems clear that each of the three elements must be considered." Wigmore, supra, § 492, at 586. In short, the question must be, "[i]s his capacity to *observe, remember,* and *recount,* such that he can probably bring added knowledge of the facts?" McCormick's Handbook of the Law of Evidence § 62, at 140 (2d ed. E. Cleary 1972) (emphasis supplied).

The elements of memory and communication ordinarily are simply stated: the witness must have the mental capacity to recollect the events testified to, understand the questions, and communicate intelligible answers.[25] However, this Court has never directly faced the question whether testimonial competency requires minimum mental capacity at the time of the events testified to. We hold that it does.

Because ability to perceive is an element of testimonial trustworthiness and a competency inquiry is directed toward trustworthiness, it follows that capacity to perceive is an essential element of testimonial competency. There is no basis for crediting the testimony of a witness who was mentally incapable of correctly perceiving the event, for he is wholly untrustworthy.[26] We are

24. "The components of credibility, i. e., the factors which determine whether testimony is believable, are the perception, memory, and narration of the witness. . . . Sometimes sincerity is also named, but in fact it seems to be but an aspect of the other three."
McCormick, supra n. 19, § 33, at 66 n. 1; see also Wigmore, supra n. 19, § 478.

25. See generally Wigmore, supra n. 19, §§ 493, 494.

26. See *Holcomb v. Holcomb,* 28 Conn. 177, 181 (1859):
"The inlets to the understanding may be perfect, so far as any human eye can discern, the moral qualities may all be healthy and active, the conscience may be sensitive and vigilant, and the memory may be able to perform its office faithfully, and yet, under the influence of morbid delusions, reason becomes dethroned, false impressions from surrounding objects are received, and the mind becomes an unsafe depository of facts.

thus in agreement with the reasoning of the California Supreme Court in *People v. McCaughan,* 49 Cal.2d 409, 317 P.2d 974 (1957). Mr. Justice Traynor wrote for the court:

> "It is apparent from the requirement that the witness have the ability to give a substantially accurate account of the event witnessed . . . that he must have had the ability to perceive the event with a substantial degree of accuracy. . . . It follows that if the proposed witness was suffering from some insane delusion or other mental defect that deprived him of the ability to perceive the event about which it is proposed that he testify, he is incompetent to testify about that event."

Id. at 420, 317 P.2d at 981.

We have previously reached the same conclusion with regard to the analogous situation of mental immaturity. In *Rosche v. McCoy,* 397 Pa. 615, 156 A.2d 307 (1959), we held that a witness who was 4 years old at the time of the event and 7 years old at the time of trial was incompetent.

> "[T]he issue is not to be determined merely because of the capacity of the witness at the time he is called to communicate his thoughts in terms of language. There must be (1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that she is

The force of all human testimony depends as much upon the ability of the witness to observe the facts as upon his disposition to describe them honestly, and if the mind of the witness is in such a condition that it can not accurately observe passing events, and if erroneous impressions are thereby made upon the tablet of the memory, his story will make but a feeble impression upon the hearer, though it be told with the greatest apparent sincerity."

called to testify about and (3) a consciousness of the duty to speak the truth . . . .

. . . . . . . .

"Carolyn's memory of the event and its details did not, indeed it could not, improve as time went on. The only thing that did improve was her capacity to communicate in terms of words. But that capacity is meaningless unless supported by the capacity to note the occurrence at the time it happened and the ability to remember it."

Id. at 620–621, 622, 156 A.2d at 310–311 (emphasis removed).

We therefore hold that testimonial competency requires mental capacity to perceive the event with a substantial degree of accuracy. "[A]n incapacity to observe intelligently at the time of the events to be observed would suffice to exclude the person." Wigmore, supra, § 493, at 586 (emphasis removed).

The degree of mental capacity required is impossible to formulate precisely, and accordingly the determination of competency rests in the sound discretion of the trial court.[27] One guideline for the exercise of discretion is that the degree of capacity required for testimonially competent perception, recollection, and narration is proportionate to the complexity of the event testified to.

"Simple tasks call for comparatively simple skills. A person called upon to make a simple identification and tell what he saw with a minimum of interpretation of the meaning of the events related requires little else than correct perception. If a person is asked to interpret a highly complex set of events whose understanding calls for acute facility in the difficult processes of logical reasoning, however, a higher degree

27. *Commonwealth v. Kosh*, supra n. 20, at 155, 157 A. at 482; Wigmore, supra n. 19, § 496.

of intelligence may be needed for both comprehending and communicating the information. More intelligence is required for a witness to testify to complex contract negotiations than to an automobile accident in which he was not a party or otherwise emotionally involved."

Weihofen, Testimonial Competence and Credibility, 34 Geo.Wash.L.Rev. 53, 58 (1965) (footnote omitted); see *Rosche v. McCoy*, supra, at 621, 623, 156 A.2d at 310, 311.

In this case, Chase, Marshall, and Whelan simply repeated statements Ware made to them or in their presence. Trustworthy testimony required little more than audition, simple recollection, and recital; a "minimum of interpretation"[28] and no "exercise of contemporaneous judgment"[29] were involved. Accordingly, the mental capacity required of them to meet the test of competency is minimal indeed.

The Commonwealth produced Dr. Bernard Willis, a psychiatrist and the clinical director of Farview State Hospital, who testified out of the presence of the jury. He was professionally familiar with the mental condition of Ware and the three witnesses from both personal observation and staff reports. His testimony (which was the only extrinsic evidence admitted on the subject of competency) dealt with all four.

John Chase was admitted to Farview on April 1, 1958, and remained there through the time of the trial. He suffered from chronic paranoid schizophrenia. Dr. Willis testified, however, that his mental illness was "compartmentalized," limited to delusions of a conspiracy against him by organized crime. Apart from these delu-

28. Weihofen, supra n. 19, at 58.

29. *Rosche v. McCoy*, 397 Pa. 615, 623, 156 A.2d 307, 311 (1959).

sions, his mind operated normally.[30] Because on any matter related to Paul Ware "no aberration appears,"[31] Chase was "capable of giving a correct account of the matters which he has . . . heard in reference to the questions at issue,"[32] and thus a competent witness.[33]

Edward Whelan was a Farview inmate from March 20, 1969, to November 28, 1971, while he was incompetent to stand trial for crimes of which he was accused. Dr. Willis testified that Whelan suffered from delusions

---

30. Dr. Willis testified as follows:
"Q. . . . [W]ould John Wesley Chase, would he be able to or is his memory and orientation sufficient, does he have sufficient understanding to be capable of giving correct accounts of matters which he has seen or heard, in your opinion?
"A. In my opinion, if the matters that he is recounting don't have anything particularly to do with his delusional system, that his accuracy of recall would be the same as anyone else's.

. . . . . . . . . .

"Q. . . . [Y]ou say as to events that occur outside [his] basic delusional system, that his recall, I think you stated, is as good as anybody else's, his memory?
"A. In other aspects he gives every indication of being quite normal. His relationships with the other patients, his relationships with the guards, his memory, his understanding of what is going on, his ability to promote himself and get things that he wants indicate generally a fairly good, quite good basic operation.

. . . . . . . . . .

"Q. Specifically if he had a conversation with this defendant, Paul Ware, or for that matter any of the inmates at Farview about crimes they may have committed or they said they may have committed, would he be able to recount that accurately outside of his delusional system?
"A. In my opinion, he would be, yes."

31. Wigmore, supra n. 19, at 586; see n. 23 supra.

32. *Commonwealth v. Kosh,* supra n. 20, at 156, 157 A. at 482.

33. On the "oath" branch of the *Kosh* test, Dr. Willis testified as follows:
"Q. . . . [A]re you able to form an opinion as to whether this individual, John Chase, if he were to be called at this trial at this time as a witness, whether he would be able to distinguish between the truth and falsehood and understand his obligation under oath to tell the truth?
"A. Yes, he would have such an understanding."

about the assassination of President Kennedy. He added, however, that Whelan's delusions were limited to that area; otherwise, his mind functioned normally.[34] Because he, like Chase, entertained no delusions on any subject even remotely connected with Ware, there is no doubt that he was competent to testify to the admission made to him by Ware.[35]

 ■ The evidence concerning Clarence Marshall does not indicate a compartmentalized illness. It is therefore necessary to determine his capacity to observe, remember, and narrate. Dr. Willis testified clearly and convincingly concerning Marshall's memory, communication,

34. Dr. Willis testified:
 "In the case of Mr. Whelan, he had preoccupation with and delusions about the assassination of President Kennedy. He focused on these matters. He attributed influences in the area of the assassination to their having an effect on his life and explanation and reason for his being sent to Farview.
 "While his thinking was clearly delusional it was to a degree compartmentalized. In areas quite away from or apart from his delusional system he would function generally as well as anyone else. It would only be in the area of his particular expression of illness where his thinking would be disordered so that you would bring into question the possibility of his accuracy of recall."

35. Dr. Willis also testified as follows:
 "Q. . . . [F]rom your knowledge of Edward Whelan are you able to say whether in fact, he could differentiate between the truth and a lie, he would understand the nature and quality of an oath to tell the truth? Can you give us that opinion?
 "A. From my knowledge of the patient over the several years that he was in the hospital I would believe now that he would be competent to tell the difference between a falsehood and the truth.
 "Q. Now, secondly, Edward Whelan . . . is going to recount a conversation he had somewhere in a period of four months in the middle of 1969, that he had with or overheard this defendant Paul Ware say . . . . Do you have an opinion on whether Edward Whelan could give us his memory and thinking processes intact sufficiently to give us an accurate account of what he heard Paul Ware say in that time period?

 . . . . . . . . . . .

 "A. In my opinion, he would be able to give you an accurate recounting of conversations between him and others at that time."

and sincerity;[36] those parts of the test are abundantly satisfied. Therefore, only his perceptive capacity requires further inquiry.

Marshall was a Farview inmate from November 14, 1960, to December 31, 1964. According to Dr. Willis, after Marshall had been sentenced at age 20 to a term of 30 to 80 years imprisonment,

"He became very moody, he became very depressed, he was filled with bitterness, he was filled with anger. He was just so charged with negative emotions that he just couldn't think straight and even began to have mild kinds of hallucinations. . . .

. . . . . . . .

"He was overpowered, he was overwhelmed by his emotions."

Marshall was subject to auditory hallucinations. However, the possibility that he hallucinated the Ware admission was convincingly excluded by Willis' testimony:

"These were mild or primitive hallucinations, if you will, since they were simply sounds, they were not

36. Dr. Willis testified:
"Q. From your examination of Clarence Marshall at Farview and your examination of him [the day before Willis testified] are you able to—and your overall supervision of his case while he was at Farview—are you able to give us an opinion on whether Clarence Marshall if he took the witness stand in this trial would be able to differentiate between the truth and falsehood, and understand the meaning and the obligation of his oath to tell the truth?
"A. I think he would clearly understand both those things, the difference between truth and falsehood and the meaning of his oath.
"Q. And, Doctor, again from all your observations at Farview, your personal psychiatric examinations, your examination with him yesterday, your supervision of his case, are you able to form an opinion as to whether if he took the stand at this trial, whether he would be capable, whether he has the sufficient orientation and memory, those facilities are intact enough that he is capable of giving correct accounts of matters which he has seen or heard?
"A. In my opinion, he would ably give a very clear, lucid and accurate recall."

voices. They did not convey any message, they weren't well developed hallucinatory experiences. . . . But the important thing is not so much the quality of the sound, but it was not a voice, it didn't have information, it wasn't conveying a message, and it was not part of a delusional system . . . ."

We conclude that, in light of the minimal perceptive capacity required, Dr. Willis' affirmation that Marshall "is capable of giving correct accounts of matters which he has . . . heard" was a sufficient basis for the trial court to find that Marshall possessed the requisite perceptive capacity.

Accordingly, the trial court did not abuse its discretion by overruling appellant's objections to the competency of Chase, Whelan, and Marshall and permitting them to testify to appellant's admissions.

■■■■■■■ However, appellant also contends that it was error to permit testimony of his admissions for the additional reason that he was incompetent at the time he allegedly made them. We disagree.

Appellant relies on *Commonwealth v. Mozzillo,* 443 Pa. 171, 278 A.2d 874 (1971), in which the defendant was found incompetent to stand trial and was committed to an institution for mental defectives. When he was later tried, the prosecution produced a guard who testified to hearing Mozzillo make incriminating statements on numerous occasions. This Court reversed his conviction.

There we held, first, that the competency of hearsay declarants to make admissions "is governed by rules of testimonial capacity," namely, the *Kosh* test. 443 Pa. at 176, 278 A.2d at 877. We further held that, if an accused is institutionalized for incompetence to stand trial when he makes incriminating admissions, the presumption of competency is reversed and the Commonwealth

has the burden of establishing that he was testimonially competent at the time the admissions were made.[37]

Finally, we held that, in that case, the Commonwealth failed to meet its burden because the evidence presented was irrelevant to Mozzillo's competency at the time of his admissions.

"We do not think that [the Commonwealth's expert witness'] testimony can be relied upon to prove appellant's competency at the time of his admissions. [The expert's] examination took place more than two months after appellant made the last of his statements, and [the expert] admitted that he could only speculate as to appellant's mental condition at earlier times."

443 Pa. at 176–177, 278 A.2d at 877. Appellant contends that the Commonwealth failed to meet its burden here because its evidence did not establish his competency at the time of his admissions. We disagree.

Ware was institutionalized from January 8, 1964, to July 19, 1967, and from May 26, 1969, to August 3, 1969. The admissions were made to Chase on January 9, 1964; to Marshall sometime in the latter half of 1964; and to Whelan "in May or June, possibly July of 1969." There were seven formal staff psychiatric evaluations of

---

**37.** "The only witnesses to the behavior of one detained for being incompetent to stand trial during the period of his detention are either employees of the Commonwealth or other inmates, most of whom are also incompetent. Under such circumstances, it would be cruel to place the burden on the inmate to prove his incompetence, especially when neither he nor his attorney knows it will be an issue until later, when the Commonwealth brings him to trial. Instead, since the Commonwealth is in control of his detention and the use it wishes to make of any admissions he makes, the burden should be placed on it to show that he was competent at the time his admissions were made."

*Commonwealth v. Mozzillo,* 443 Pa. 171, 177, 278 A.2d 874, 877 (1971).

See also *District of Columbia's Appeal,* 343 Pa. 65, 72, 21 A.2d 883, 887 (1941) (adjudication of insanity creates a presumption that a hearsay declarant is testimonially incompetent).

Ware;[38] Dr. Willis participated in five of those [39] and reviewed all of them. In addition, he reviewed substantial information from staff members, including the head of the social services department, who was Ware's group therapist.

In contrast to *Mozzillo*, Willis' opinion was based on examinations of Ware either close in time to the admissions or both before and after the admissions. A full psychiatric evaluation was conducted 22 days after the statement to Chase. The statement to Marshall was both preceded and followed by psychiatric evaluations. The conversation overheard by Whelan occurred within less than one and a half months of an evaluation. We believe, in this case, the *Mozzillo* standard has been satisfied.

More importantly, in *Mozzillo* the expert "admitted that he could only speculate" as to the defendant's condition at the time he made damaging admissions. Here, Dr. Willis' expert opinion establishing Ware's testimonial competency covered the entire period of Ware's commitment and obviously included the relevant times he made incriminating statements:

"Q. . . . [D]uring the times, both periods, that Mr. Ware was at Farview, are you able to say whether or not if he were to make a statement to someone about something he did or heard or saw he would have sufficient memory and orientation and understanding to give an accurate account of what he was saying?

"A. I would expect that he would have adequate recall for his conversations generally.

"Q. And can you pinpoint that as to any time or at all times or whatever?

**38.** They occurred on January 31, 1964; May 4, 1964; April 4, 1965; February 15, 1966; November 29, 1966; June 2, 1967; June 20, 1969.

**39.** May 4, 1964; February 15, 1966; November 29, 1966; June 2, 1967; June 20, 1969.

"A. At all times that Mr. Ware was in Farview on his two admissions, in my opinion, he knew at all times what he was doing, the difference between right and wrong, truth or falsehood; that he had control over his behavior to the point where whatever he did he did basically and deliberately and with full knowledge.

"Q. . . . [C]an you state that at all times during those two periods he had the competency to be able to be a witness . . . ?

"A. In my opinion, at all times this patient would be considered as a witness. . . . [T]here was a consistency of behavior that compels me to believe and leaves me with a very strong opinion that at no time during his stay at Farview was this man incapacitated insofar as his competency to be a witness is concerned."

Dr. Willis' testimony establishes that Ware had sufficient capacity to accurately recall and communicate.[40] The trial court therefore acted within its discretion in properly overruling appellant's objections and admitting the testimony of Chase, Marshall, and Whelan.

Appellant next argues that the trial court erred in permitting the jury to consider the testimony of Chase, Marshall, and Whelan reporting his extra-judicial admissions because the Commonwealth failed to establish the corpus delicti. We disagree.

---

**40.** The reason for placing the burden on the Commonwealth offered by *Mozzillo,* supra n. 37, does not apply to Ware's capacity to perceive at the relevant time, which was of course before his commitment to Farview. Accordingly, the presumption of capacity is applicable; appellant did not rebut it in this case. See text accompanying n. 21 supra; cf. *Robinson v. United States,* 113 U.S.App.D.C. 372, 308 F.2d 327, 332 (1962), cert. denied, 374 U.S. 836, 83 S.Ct. 1887, 10 L.Ed.2d 1058 (1963); 6 J.Wigmore, Evidence § 1751, at 156 (3d ed. 1940).

In addition, "[t]he oath-capacity is a purely artificial one . . ., and has no inherent relation to testimonial capacity. It has no place in excluding extrajudicial declarations forming exceptions to the Hearsay rule . . . ." Id. (emphasis removed).

 We have followed Professor Wigmore's analysis that a crime conceptually consists of three elements: "first, the occurrence of the specific kind of injury or loss . . . ; secondly, somebody's criminality (in contrast, e. g., to accident) as the source of the loss,—these two together involving the commission of a crime by somebody; and, thirdly, the accused's identity as the doer of this crime." 7 J. Wigmore, Evidence § 2072, at 401 (3d ed. 1940) (emphasis removed); see *Commonwealth v. May,* 451 Pa. 31, 32, 301 A.2d 368, 369 (1973). Corpus delicti, meaning "body of the crime," consists of the first two elements. *Commonwealth v. May,* supra; *Commonwealth v. Rhoads,* 225 Pa.Super. 208, 213, 310 A.2d 406, 409 (1973). Specifically, " '[t]he corpus delicti [in a murder prosecution] consists of proof that a human being is dead and that such death took place under circumstances which indicate criminal means or the commission of a felonious act.' " *Commonwealth v. Milliken,* 450 Pa. 310, 317, 300 A.2d 78, 82 (1973), quoting *Commonwealth v. Frazier,* 411 Pa. 195, 202, 191 A.2d 369, 373 (1963).

 Appellant invokes the rule that a criminal conviction may not be based on the extra-judicial confession or admission of the defendant unless it is corroborated by independent evidence establishing the corpus delicti. See *Commonwealth v. May,* supra; *Commonwealth v. Leamer,* 449 Pa. 76, 295 A.2d 272 (1972); *Commonwealth v. Palmer,* 448 Pa. 282, 285, 292 A.2d 921, 922 (1972); R. Perkins, Criminal Law 98 (2d ed. 1969). This rule is rooted in a hesitancy to convict one of crime on the basis of his own statements only.

"The grounds on which the rule rests are the hasty and unguarded character which is often attached to confessions and admissions and the consequent danger of a conviction where no crime has in fact been committed . . . ."

■■■■■■■■■■■■■■■■■

*Commonwealth v. Turza,* 340 Pa. 128, 134, 16 A.2d 401, 404 (1940). Therefore, the rule requires that the prosecution introduce evidence independent of the defendant's statements which establishes that a crime has in fact occurred.[41] See generally 3 Wharton's Criminal Evidence § 691 (13th ed. C. Torcia 1973).

■■■■■■ The first element, that a human being is in fact, dead, rarely presents difficulty.[42] But proof of the second element—that death "occurred through a criminal agency," *Commonwealth v. May,* supra, at 32, 301 A.2d at 369—frequently is disputed. Often the circumstances of death are such that homicide cannot be established absent the statements of the accused as the cause of death to the exclusion of the accident or suicide. Accordingly, we have held that the corroboration policy is satisfied if the independent evidence "points to an unlawful killing, although it may indicate as well accident or suicide," *Commonwealth v. Coontz,* 288 Pa. 74, 79, 135 A. 538, 539 (1927), or " 'where the circumstances attending the death are consistent with crime, though they may also be consistent with accident . . . or suicide.' " *Commonwealth v. Turza,* supra, at 135, 16 A.2d at 405. Although corroboration is insufficient if the independent evidence is equally consistent with accident or criminality, *Commonwealth v. Leslie,* 424 Pa. 331, 227 A.2d 900

---

41. The rule is frequently articulated in terms of a condition on the admissibility of the defendant's statements; see e. g., *Commonwealth v. Palmer,* 448 Pa. 282, 285, 292 A.2d 921, 922 (1972). "Because of the trial court's discretion over the order of proof, however, it is for practical purposes not a condition of admissibility but rather . . . a formulation of the required proof to take the case to the trier of fact or to sustain a finding of guilt." McCormick's Handbook of the Law of Evidence § 158, at 347 (2d ed. E. Cleary 1972) (footnote omitted); see *Commonwealth v. Burns,* 409 Pa. 619, 637, 187 A.2d 552, 561–562 (1963); *Commonwealth v. Lettrich,* 346 Pa. 497, 498, 31 A.2d 155, 156 (1943); *Commonwealth v. Ferguson,* 162 Pa.Super. 199, 202, 56 A.2d 360, 361 (1948).

42. See Perkins, The Corpus Delicti of Murder, 48 Va.L.Rev. 173, 182–86 (1962).

(1967), "the prosecution has no duty to affirmatively exclude the possibility of accident or suicide in order to establish the corpus delicti." *Commonwealth v. May,* supra, at 33, 301 A.2d at 369–370.[43]

█ In light of these principles, we conclude that appellant's contention that the Commonwealth failed to independently establish the second constituent of the corpus delicti so as to justify the consideration of his statements is without merit. The circumstances of the death of Miss Grauley clearly point to and are consistent with felonious homicide. The assistant county medical examiner testified that the injuries which caused death were "consistent with either a fall or a push or being thrown down a flight of 14 steps and coming to rest on a cement floor at the bottom."

In addition, the condition of the victim's home at the time of the discovery of her body indicated that a burglary had probably taken place. Witnesses testified that several rooms had been ransacked. Bureau drawers had been emptied onto the floor. Torn church offering envelopes were scattered on a table and the floor in the living room. Marks on the front door showed that it had probably been jimmied in a forced entry.

The nature of the fatal wounds and the state of the victim's home established that death probably resulted

---

**43.** We do not lose sight of the distinction between the requirement of corroboration of the statements of the accused and the Commonwealth's ultimate burden of proof. The former merely requires that the trial court be satisfied that a conviction will not result from a confession or admission when no crime has in fact been committed by anyone. Ultimately the Commonwealth must prove beyond a reasonable doubt that a crime has in fact been committed. *Commonwealth v. May,* 451 Pa. 31, 33 n. 2, 301 A.2d 368, 370 n. 2 (1973); *Commonwealth v. Maybee,* 429 Pa. 222, 223, 239 A.2d 332, 333 (1968); see generally *Commonwealth v. Rose,* 457 Pa. 380, 321 A.2d 880 (1974). *Commonwealth v. Maybee,* supra, and *Commonwealth v. Deyell,* 399 Pa. 563, 160 A.2d 448 (1960), are examples of the Commonwealth's failure to finally prove beyond a reasonable doubt that a crime had in fact been committed.

from homicide in the course of a burglary. Thus, the Commonwealth has "established . . . that the death occurred under circumstances indicating that it was criminally caused by someone . . . ." *Commonwealth v. Turza,* supra, at 134, 16 A.2d at 404 (emphasis removed). Accordingly, it was proper to permit consideration of appellant's admissions.

■■ Appellant contends that he was denied a fair trial by the denial, without a hearing, of pretrial discovery of the identity of certain Commonwealth witnesses (Chase, Marshall, and Whelan). In earlier pretrial proceedings, appellant learned that the Commonwealth intended to present several witnesses to testify to incriminating admissions he had made. After informal requests for disclosure failed, appellant moved for the designation of names of the witnesses, which was denied by the calendar judge without a hearing. He now claims that he had a right to a hearing for the purpose of establishing his right to disclosure.

Pretrial discovery in criminal cases is governed by Pa.R.Crim.P. 310, which in pertinent part provides:

"All applications of a defendant for pretrial discovery and inspection shall be made not less than five days prior to the scheduled date of trial. The court may order the attorney for the Commonwealth to permit the defendant or his attorney, and such persons as are necessary to assist him, to inspect and copy or photograph any written confessions and written statements made by the defendant. No other discovery or inspection shall be ordered except upon proof by the defendant, after hearing, of exceptional circumstances and compelling reasons."

The rule does not purport to grant defendant a hearing as of right in which to prove "exceptional circumstances and compelling reasons." In order to be entitled to a hearing, he must at least allege circumstances and

reasons which, if established, would be exceptional and compelling.

Appellant's motion contained nothing of the sort. In his motion, counsel stated that disclosure was necessary for proper trial preparation and that failure to disclose might require a request for a continuance.[44] The benefit of discovery of opposing witnesses in preparation for trial is potentially present in every case and is not exceptional in this case. An averment that a continuance may later be requested hardly rises to the level of "compelling." Defense counsel in fact did not request a continuance when the Commonwealth presented the testimony of Chase, Marshall, and Whelan. Because the circumstances and reasons presented by appellant's motion were not exceptional or compelling, he was not entitled to a hearing or disclosure of the Commonwealth's witnesses.[45]

44. The motion stated:
 "15. Defense Counsel was unaware of the alleged witnesses for years and at this late date cannot properly prepare for trial in these cases without a proper indication of the alleged witnesses and the surrounding circumstances, particularly in view of the Commonwealth's previous position that without defendant's statements the Commonwealth could not prove its case.
 "16. If Defense Counsel must wait until the Commonwealth attempts to call the undisclosed witnesses the defense in all probability will have to move for a continuance at that time until it can investigate the character and reputation of such alleged witnesses, as well as the circumstances under which they may have obtained any statement from the defendant in the course of his confinement and investigate the possibility of duress or lack of voluntariness therein."

45. Appellant cites *Commonwealth v. Turra*, 442 Pa. 192, 275 A.2d 96 (1971), as authority for his entitlement to a hearing. In this he is mistaken. In *Turra* we remanded for a hearing "because of the evident confusion during the proceedings below, plus the fact that if Turra is convicted of the murder involved his life may be forfeited . . .." Id. at 197, 275 A.2d at 98. No such circumstances are present here.
 Appellant's reliance on *Wardius v. Oregon*, 412 U.S. 470, 93 S. Ct. 2208, 37 L.Ed.2d 82 (1973), is also misplaced. *Wardius* held that a defendant may not constitutionally be compelled to disclose the names of witnesses he intends to call to establish an abili in the absence of reciprocal discovery against the prosecution. "Reciprocity . . . is the key to *Wardius*." *Com-*

Appellant finally contends that he was unfairly surprised, and thus deprived of a fair trial, by the presentation of fingerprint evidence that the Commonwealth had concealed by means of misrepresentation. We conclude that the contention is without merit.

In 1968 at a hearing on the Commonwealth's request for a nolle prosequi, an assistant district attorney stated:

"[T]here is a partial [finger]print, which print in five points of the print are [sic] exactly the same as Ware but is woefully insignificant in terms of expert testimony. Five points is [sic] not enough . . . ."

At trial in 1973, the Commonwealth presented the testimony of Jacques Whaumbush, an experienced fingerprint expert. He testified that he examined the home of Miss Grauley several hours after the discovery of her body and recovered a latent fingerprint from a torn church envelope. On the basis of a comparison of at least nine significant points, he testified that there was "[p]ositively no doubt" that "the ink rolled impression and the latent impression [found in the victim's home] was [sic] made by one and the same finger, that is, the left middle finger of Mr. Paul Ware."

Appellant argues that he relied on the 1968 representation in concluding that the prosecution would not present fingerprint evidence and was therefore unfairly surprised by the Whaumbush testimony, entitling him to a new trial. We disagree.

Appellant does not contend that the 1968 statement was an intentional attempt to deceive him. The Commonwealth never asserted that it would not use the fingerprint as evidence against Ware, nor did it conceal or

monwealth v. Jackson, 457 Pa. 79, 82, 319 A.2d 161, 163 (1974). Because the Commonwealth did not seek disclosure of the names of appellant's witnesses (and had no right to disclosure, cf. Pa.R. Crim.P. 312; Commonwealth v. Contakos, 455 Pa. 136, 314 A.2d 259 (1974)), Wardius is inapposite.

deny the existence of any relevant evidence.[46] The representation was merely an individual prosecutor's estimate of the probative significance of the recovered print. It was not unfair for the Commonwealth to re-evaluate its evidence; any argument to the contrary is meritless.

Judgment of sentence affirmed.

NIX, J., did not participate in the consideration or decision of this case.

---

**46.** Compare *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963); ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function § 3.11(a) (Approved Draft, 1971).