Dennis K. JOHNSONBAUGH, Petitioner,

v.

### DEPARTMENT OF PUBLIC WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 3, 1995.

Decided Aug. 31, 1995.

Kenneth A. Wise, for petitioner.

Robert M. Miller, Jr., Assistant Counsel, for respondent.

Before McGINLEY and NEWMAN, JJ., and RODGERS, Senior Judge.

McGINLEY, Judge.

Dennis K. Johnsonbaugh (Petitioner) seeks review of the order of the State Civil Service Commission (Commission) which dismissed the Petitioner's appeal of his removal as a Therapeutic Recreation Services Worker (TRS Worker) with the Pennsylvania Department of Public Welfare (DPW) at the Harrisburg State Hospital (Hospital).

By letter dated September 9, 1992, Petitioner was dismissed as a TRS Worker at the Hospital for alleged patient abuse, specifically for demanding and receiving oral sex from a female patient identified as Susan R. On September 24, 1992, Petitioner appealed to the Commission challenging his removal. Hearings were conducted beginning on July 26, 1993, and continuing on February 14, 1994.

In support of the charges, DPW presented Susan R. who testified that on numerous occasions, Petitioner paid her fifty cents to perform oral sex, that three to six encounters took place on an elevator and that other encounters occurred in a kitchen and in a storage room. DPW also produced Lois G. who corroborated Susan R.'s testimony regarding Petitioner's modus operandi. Lois G., a former mental patient at the Hospital for eight years, testified that she had oral sex with Petitioner once on an elevator and twice in a storage room. John Lohr, the Hospital's Personnel Director, also testified. He noted that the reports of patient abuse from Susan R. were similar to past allegations involving Petitioner.

Dr. Edward H. Coronado, M.D. (Dr. Coronado), licensed in general psychiatry, testified that he treated Susan R. since 1987, and that she suffered from chronic schizophrenia, undifferentiated type. Dr. Coronado testified that he examined Susan R. and found that her "mental status was stable ... [that] her memory was intact ... [that] she was coherent and goal directed in her form of thought ... [and that] there was no sign of any overt hallucinations at the time." Notes of Testimony, July 26, 1993, (N.T. 7/26/93) at 24; Reproduced Record (R.R) at 43a. Dr. Coronado opined that Susan R. could distinguish between truth and falsity and that she understood the events at issue and could appropriately answer questions concerning the incidents. N.T. 7/26/93 at 26, R.R. at 45a.

Dr. Inesh Jindal, M.D. (Dr. Jindal), licensed in general psychiatry, testified that he first examined Lois G. in April or May of 1989 and that she suffers from schizo-effective disorder. Dr. Jindal opined that Lois G. could distinguish between truth and falsity and that she, too, understood the events surrounding the alleged incidents.

Petitioner testified that the accusations against him were not true and that it was not uncommon for mental patients at the Hospital to fabricate accusations against their custodians. Petitioner testified that Susan R. was "manipulative" with "a long history of ... accusations, inappropriate comments, gestures, touching ... [and] ... propositioning people." Notes of Testimony, February 14, 1994, (N.T. 2/14/94) at 229–230; R.R. at 248a–249a. Petitioner also testified that Susan R. threatened him and stated that " 'if you get me into trouble and I lose my free time ... I'm going to tell them I had oral sex with you' " and that " 'I'll tell them you made me do it for a lousy 50 cents.' " N.T. 2/14/94 at 235; R.R. at 245a.

Petitioner also presented the testimony of his former supervisor Thomas A. Tedeschi (Tedeschi). Tedeschi testified that Petitioner "was a very good therapist and a very good person." N.T. 2/14/94 at 263; R.R. at 282a. Tedeschi also testified on cross-examination that Susan R. approached him on several occasions and said, " 'I'm carrying your baby.' " N.T. 2/14/94 at 286; R.R. at 305a. Finally, Tedeschi testified that he frequently found Susan R. having sex with male patients at the Hospital.

Edward J. Moran (Moran) and Pete Cooper, Petitioner's co-workers, and Deborah Hardy (Hardy), Petitioner's former supervisor, also testified. They corroborated Tedeschi's testimony that Susan R. engaged in sex with male patients at the Hospital and that she often stated she was carrying other staff members' babies.

The Commission found that Susan R. performed oral sex upon Petitioner on numerous occasions and at various locations, stating:

> Relative to the substantive charges underlying the appellant's [Petitioner's] removal—i.e., demanding and receiving sexual favors from a patient—we find that the appointing authority [DPW] has presented credible evidence sufficient to establish its charge. Having deemed Susan R. competent to testify, we hereby base our determination upon finding her testimony, as to the occurrence of incidents of sexual episodes with the appellant [Petitioner], more credible than that of the appellant [Petitioner]. Lois G.'s testimony to similar experiences in similar locations lends additional credence to Susan R.'s testimony. We, therefore, find the appellant's [Petitioner's] remaining arguments, including his assertion that Susan R.'s report was made in retaliation for his disciplining of her, not credible.

Commission's Adjudication, September 2, 1994, at 5; R.R. at 422a.

Additionally, Petitioner sought unemployment compensation benefits. DPW contested Petitioner's claim asserting that Petitioner's termination resulted from willful misconduct. Following a hearing on December 7, 1992, the unemployment compensation referee found that "[t]he claimant [Petitioner]

never committed any act of patient abuse during his employment with Harrisburg State Hospital." Referee's Decision, December 10, 1992, at 1, Finding of Fact No. 6; R.R. at 9a. The referee concluded that "the employer has provided no first-hand testimony relating to any acts of patient abuse on the part of claimant" and that "the referee in no way questions the employer's right to discharge the claimant ... claimant [is not] ineligible to receive benefits under the ... law." Referee's Decision at 2; R.R. at 10a. DPW did not appeal the referee's decision.

■ On appeal Petitioner contends: 1) that the Commission erred when it refused to hold that the findings of the unemployment compensation referee collaterally estopped the present removal action; 2) that the Commission's decision is not supported by substantial evidence because the decision was based upon the incompetent testimony of Susan R.; 3) that Dr. Coronado was not legally competent to testify because he was not board-certified, board-eligible or licensed to practice medicine; 4) that Petitioner was denied due process of law; and 5) that Petitioner was denied a fair hearing before an impartial tribunal. Our scope of review is limited to determining whether the Commission's findings are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. *Master v. State Civil Service Commission,* 14 Pa.Commonwealth Ct. 393, 322 A.2d 426 (1974).

## I. Estoppel

■ Initially, Petitioner contends that he should be reinstated to his position as a matter of law because the issue of his alleged misconduct was previously litigated in the unemployment compensation proceeding and decided in his favor. In a second action by the same parties upon a different claim, the judgment in the prior action operates as an estoppel in the second action only if the matters at issue 1) are identical, 2) were actually litigated, 3) were essential to the judgment, and 4) were material to the litigation. *Wright v. Workmen's Compensation Appeal Board (Adam's Mark Hotel),* 163

Pa.Commonwealth Ct. 172, 639 A.2d 1347 (1994). Petitioner asserts that the prior findings and conclusion made by an unemployment compensation referee regarding "willful misconduct" collaterally estop the litigation of the issue of "just cause for removal" in a proceeding before the Commission. We addressed this exact issue in our recent decision in *Morrison v. Department of Corrections*, Pa.Commonwealth Ct., 659 A.2d 620 (1995).

In *Morrison*, we noted that a civil service employee must appeal the appointing authority's decision directly to the Commission, but in unemployment compensation cases a party appeals a validity determination first to a referee and then to the Board, which acts as the ultimate finder of fact. *Unemployment Compensation Board of Review v. Wright*, 21 Pa.Commonwealth Ct. 637, 347 A.2d 328 (1975). We held that a prior decision by an unemployment compensation referee on the issue of willful misconduct does not preclude the appointing authority from asserting just cause for removing an employee in a Commission proceeding. We reasoned that the matters considered by the referee in determining willful misconduct are not always essential to the adjudication of just cause for removal by the Commission and that it has long been held that "[j]ust cause justifying the removal of a Civil Service employee is clearly a different standard from that of willful misconduct...." *Lebanon County Board of Assistance, Department of Public Welfare v. Unemployment Compensation Board of Review*, 16 Pa.Commonwealth Ct. 558, 560, 332 A.2d 888, 889 (1975).

■ The prior adjudication on the issue of willful misconduct in the unemployment compensation action did not estop the Commission from subsequently adjudicating just cause for dismissal because the matters at issue in the unemployment compensation adjudication were not essential to the proceeding before the Commission.[1] It is of tantamount importance that collateral estoppel between administrative agencies is only appropriate when the policies and goals are the same in both proceedings and that is not the situation here. *Odgers v. Unemployment Compensation Board of Review*, 514 Pa. 378, 525 A.2d 359 (1987). Accordingly, the Commission was not estopped.

## II. Competency of Susan R.

■ Petitioner next contends that Susan R. was not legally competent to testify concerning the alleged incidents of patient abuse because she was a mental patient diagnosed as a schizophrenic with delusional episodes. Petitioner asserts that as a result of her mental illness, Susan R.'s ability to correctly observe events was compromised. Therefore, Petitioner contends that there is no substantial evidence to support the Commission's decision.

■ It is well settled that a person with a mental illness is competent to testify if she is capable of giving a correct account of the matters which she has seen or heard in reference to the questions at issue. *Kakas v. Department of Public Welfare*, 65 Pa.Commonwealth Ct. 550, 442 A.2d 1243 (1982), (citing *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974)). "There is a presumption of competency which the opponent of a witness has the burden to overcome and which is not defeated by a bare showing of mental illness." *Commonwealth v. Garcia*, 478 Pa. 406, 425, 387 A.2d 46 (1978). Finally, a prior determination of a witness's competency will not be disturbed absent a clear abuse of discretion. *Ware*.

In the present controversy, Dr. Coronado opined that Susan R. was able to recollect the events at issue, understand the questions posed and communicate intelligible answers. N.T. 7/26/93 at 26; R.R. at 45a. Susan R. testified that she engaged in oral sex[2] with

---

1. We note DPW did not present any first-hand testimony in the unemployment compensation hearing and did not appeal the referee's decision.

2. Nina M. Monticelli (Monticelli), DPW's attorney, to Susan R.:
   Q: Did you ever have oral sex with Johnsonbaugh?
   A: Yes.
   ....
   Q: Okay. And what occurred?
   A: Well, a sexual act.
   Q: Okay. Where were you?
   A: I was partially on my knees—
   Q: Okay.

Petitioner on several occasions[3] and at different locations within the Hospital.[4]

Further, Dr. Coronado noted that there are times when schizophrenics are in contact with reality. N.T. 7/26/93 at 44; R.R. at 63a. Dr. Coronado opined that Susan R. was not delusional because she did not express any sexual episodes with Hospital staff other than the incidents involving Petitioner.[5] The Commission accepted this testimony and concluded Susan R. was not delusional. It was within the province of the Commission to determine whether Susan R. possessed the mental capacity to understand questions, communicate intelligible answers and recollect the events at issue.[6] Based upon the testimony produced the Commission did not abuse its discretion in finding Susan R. competent to testify and also finding there was substantial evidence to support Petitioner's dismissal.

### III. Competency of Dr. Coronado

■ Petitioner also contends that Dr. Coronado was not competent to testify as an expert because he lacked board certification and was not licensed to practice psychiatry. The record reveals that Dr. Coronado was on the psychiatric staff of the Hospital beginning in 1986; that he graduated from Far Eastern University Medical School, located in the Philippines, in 1976; that he served a one year internship and three years as a psychiatric resident at the University of Kansas School of Medicine; and that he was familiar with Susan R's mental status. N.T. 7/26/93 at 19–20, 45; R.R. at 38a–39a, 64a. Further, there is no evidence of record indicating that Dr. Coronado was not licensed in Pennsylvania. To the contrary, he is on staff at a state hospital.

DPW established that Dr. Coronado has special knowledge, experience, training and education in psychiatry and therefore was qualified to testify as an expert. Petitioner's argument that Dr. Coronado was neither board certified nor board eligible goes to the weight of the doctor's opinion, not to whether he is competent to testify. The Commission did not abuse its discretion in allowing him to testify as an expert. *Commonwealth v. Webster*, 517 Pa. 578, 539 A.2d 804 (1988).

---

A: —doing it.
. . . .
Q: Okay. Did he ever pay you?
A: Fifty cents each time.
N.T. 7/26/93 at 47, 49 and 52; R.R. at 66a, 68a, and 71a.
Kenneth Wise, Petitioner's attorney, to Susan R.:
Q: You said you had oral sex with Mr. Johnsonbaugh?
A: Yes.
N.T. 7/26/93 at 55; R.R. 74a.

3. Kenneth A. Wise (Wise), Petitioner's attorney, to Susan R.:
Q: Do you remember how many times?
. . . .
A: Okay, three and six, three or six.
N.T. at 76; R.R. at 95a.

4. Monticelli to Susan R.:
Q: Can you describe the room[s] where you were?
A: The elevator and the office of R.T.
. . . .
A: In a small room called a kitchen.
. . . .
A: —the storage room.
N.T. 7/26/93 at 48, 51; R.R. 67a, 70a.

5. Dr. Coronado agreed hypothetically that if Susan R. expressed delusions of having sex with other staff members then it would be more likely that Susan R.'s allegations of sex with Petitioner were also delusional. N.T. 7/26/93 at 36–38; R.R. at 55a–57a. Susan R. testified that she never accused any other Hospital staff member of any sexual impropriety other than the Petitioner. N.T. 7/26/93 at 55; R.R. at 74a. Susan R.'s testimony is corroborated by Petitioner's witnesses, Tedeschi, Moran, and Hardy. Tedeschi testified that Susan R. never accused him of any sexual impropriety. N.T. 2/14/94 at 270; R.R. at 289a. Moran testified that Susan R. did not accuse anyone other than Petitioner of sexual impropriety. N.T. 2/14/94 at 310; R.R. at 329a. Hardy also testified that Susan R. did not accuse any Hospital staff of sexual impropriety other than Petitioner. N.T. 2/14/94 at 358; R.R. at 377a.

6. Petitioner also asserts that DPW admits that Susan R. "is delusional and [that] she will go on about the Devil, and she will go on about Jesus Christ...." N.T. 7/26/93 at 54; R.R. at 73a. Petitioner also refers to specific incidents where Susan R. blurted out "[o]h, my God" and "[o]h, [n]ude [j]okes" during her testimony. N.T. 7/26/94 at 59, 60; R.R. at 78a, 79a. While her testimony was unresponsive and inappropriate at times, Susan R. consistently stated that she did not have any sexual encounters with Hospital staff other than Petitioner. These matters go to the weight given her testimony; not her competency.

## IV. Due Process

Petitioner next contends that he was denied due process of law. Specifically, Petitioner asserts: 1) that the Commission abused its discretion by quashing his subpoena duces tecum requesting Susan R.'s and Lois G.'s mental health records; 2) that the Commission erred by permitting Dr. Coronado and Dr. Jindal to testify concerning the mental health of Susan R. and Lois G. without their written consent in violation of Section 111 of the Mental Health Procedures Act (Mental Health Act), Act of July 9, 1976, P.L. 817, 50 P.S. § 7111; and 3) that Petitioner was denied the opportunity to review the mental health records of Susan R. and Lois G. and as a result was unable to effectively confront and cross-examine them. We shall address each prong of this argument seriatim.

■ Petitioner first asserts that the Commission abused its discretion by quashing his subpoena requesting the medical records of Susan R. and Lois G. Section 111 of the Mental Health Act provides:

All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except:

(1) those engaged in providing treatment for the person;

(2) the county administrator, pursuant to section 110 [50 P.S. § 7110];

(3) a court in the course of legal proceedings authorized by this act; and

(4) pursuant to Federal rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency.

In no event, however, shall privileged communications, whether written or oral, be disclosed to anyone without such written consent. This shall not restrict the collection and analysis of clinical or statistical data by the department, the county administrator or the facility so long as the use and dissemination of such data does not identify individual patients. Nothing

herein shall be construed to conflict with section 8 of the act of April 14, 1972 (P.L. 221, No. 63), known as the 'Pennsylvania Drug and Alcohol Abuse Control Act.' [71 P.S. § 1690.108]. (footnotes omitted).

In *Kakas* this Court reviewed whether the Commission abused its discretion by quashing a subpoena duces tecum. Michael Kakas (Kakas) requested the medical records of Ira Robinson (Robinson) and Vernon Gordon (Gordon), two mental patients involved in a patient abuse case.[7] In *Kakas* we noted that the legislative purpose of Section 111 was to protect the confidentiality of the records of persons receiving treatment for mental illness and that because none of the statutory exceptions applied the Commission properly quashed the subpoena.

Here, as in *Kakas,* Petitioner has failed to establish that any of the statutory exceptions apply. Also, Susan R. and Lois G. did not provide written consent to release their mental health records to Petitioner. Pursuant to Section 111 of the Mental Health Act all documents relating to a mental patient's treatment are confidential unless there is written consent or one of the enumerated exceptions apply. *See, Commonwealth v. Moyer,* 407 Pa.Superior Ct. 336, 595 A.2d 1177 (1991), *appeal denied,* 529 Pa. 656, 604 A.2d 248 (1992). Therefore, the Commission did not abuse its discretion by quashing the subpoena requesting the medical records.

■ Petitioner's second assertion is that Dr. Coronado and Dr. Jindal testified as to the mental health of Susan R. and Lois G. in violation of the confidentiality provision of Section 111 of the Mental Health Act. As noted earlier, Section 111 of the Mental Health Act provides that written consent is not necessary to disclose a patient's medical records to those engaged in providing treatment for the patient. Clearly, Dr. Coronado and Dr. Jindal were, respectively, Susan R's and Lois G's treating psychiatrists. Therefore, there was no violation of the confidentiality provision of Section 111 of the Mental Health Act and the Commission did not err by allowing Dr. Coronado and Dr. Jindal to

---

7. Robinson testified before the Commission that Kakas hit him in the mouth which resulted in the loss of seven teeth. Gordon testified that he witnessed the incident.

testify regarding Susan R.'s and Lois G.'s mental states.

██ Petitioner's third assertion is that he was denied the opportunity to effectively confront and cross-examine Susan R. and Lois G. because he was unable to review their mental health records. Petitioner asserts that a review of Susan R.'s and Lois G.'s mental health records might possibly reveal inconsistencies in their statements which would enable him to impeach their testimony and perhaps establish a motive to falsely accuse him.[8] Petitioner cites *Commonwealth v. Black*, 337 Pa.Superior Ct. 548, 487 A.2d 396 (1985), in support of his position.

██ Due process provides the accused with the right to confront, test and rebut the testimony and evidence against him. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In *Black* the Court of Common Pleas of Lawrence County (trial court) convicted Darrell Black (Black) of statutory rape, corruption of minors, incest and attempted involuntary deviate sexual intercourse with his thirteen-year-old daughter. On appeal to our Pennsylvania Superior Court, Black challenged the trial court's interpretation of Pennsylvania's Rape Shield Law (Rape Shield Law), 18 Pa.C.S. § 3104. Black contended that the trial court prevented him from introducing evidence through cross-examination that his daughter maintained a continuous sexual relationship with her fifteen-year-old brother, which terminated when he left home after an argument with Black. The Superior Court agreed and held "that insofar as the Rape Shield Law purports to prohibit the admission of evidence which may logically demonstrate a witness' bias, interest or prejudice or which properly attacks the witness' credibility, it unconstitutionally infringes upon an accused's right of confrontation...." *Black*, at 558, 487 A.2d at 401, (footnote omitted). The Superior Court also stated that "we cannot approve the complete elimination of a relevant and crucial line of cross-examination." *Id.*

Unlike the factual situation in *Black*, Petitioner was permitted to cross-examine Susan R. and Lois G. in order to impeach their testimony and demonstrate any other bias or motive to falsely accuse Petitioner. Critically, Black did not attempt to obtain any confidential records protected by the Rape Shield Law in order to confront and cross-examine his daughter. The facts in the present controversy are more analogous to those in *Commonwealth v. Davis*, 437 Pa.Superior Ct. 471, 650 A.2d 452 (1994).

In *Davis*, after a non-jury trial George Davis (Davis) was found guilty of involuntary deviate sexual intercourse, corruption of a minor and endangering the welfare of a child. On appeal Davis contended among other things that the lower court erred in not granting him access to the confidential records of the victim's family therapy counseling sessions. Davis asserted that the records contained clinical observations that the victim was a pathological liar which tended to establish that the victim was biased and untruthful. The Superior Court reviewed 42 Pa.C.S. § 5945.1(b) (Privilege) which " 'prevents sexual assault counselors from disclosing confidential communications made to them by the victims of sex related crimes ... [and] which ... is absolute and applies both to oral communications and to records created during the course of the confidential relationship.' " *Davis*, at 485, 650 A.2d at 459, (quoting *Commonwealth v. Gibbs*, 434 Pa.Superior Ct. 280, 283, 642 A.2d 1132, 1134 (1994)). The Superior Court determined that the victim and the victim's family waived the sexual assault counselor privilege because the victim and his family consented to disclose the confidential records to the Commonwealth's attorney and also to allow the therapist to testify for the Commonwealth. The Superior Court stated "that any privilege protecting the victim's family therapy counseling records was waived by the victim and his family when they permitted the Commonwealth to have access to the same records which they sought to shield from the defense." *Davis*, at 487, 650 A.2d at 460.

8. Petitioner requested the medical records in order to show that Susan R. and Lois G. previously stated that at least one of their reported sexual

incidents was unwanted and that if such a statement was made, it would appear in their medical records.

In the present controversy, Susan R. and Lois G. consented in writing and permitted DPW to review at least portions of their mental health records.[9] Petitioner's attorney objected to DPW's access to Susan R. and Lois G.'s confidential records because the records were not disclosed to him and without the records he was unable to effectively cross-examine Susan R. and Lois G. as well as Dr. Coronado and Dr. Jindal.[10] As noted earlier Section 111 precludes the release of confidential information to either DPW or Petitioner absent written consent. Susan R.'s and Lois G.'s consent to release portions of their mental health records to DPW is equivalent to a waiver of the confidentiality privilege, entitling Petitioner to review the disclosed portions of the records. Under these circumstances, Susan R.'s and Lois G.'s privacy rights must yield to Petitioner's right of confrontation. *See Davis; see also Commonwealth v. Lloyd,* 523 Pa. 427, 567 A.2d 1357 (1989) (dealing with the confidentiality of psychiatric records under the common law privilege).

Petitioner's review of the disclosed portions of the records may reveal information relevant in impeaching Susan R., Lois G., Dr. Coronado or Dr. Jindal. Therefore, it is necessary to remand this matter to the Commission in order for Petitioner to review the portions of Susan R.'s and Lois G.'s mental health records that were disclosed to DPW. Petitioner may request a new hearing for the purpose of conducting further cross-examination of Susan R., Lois G., Dr. Coronado or Dr. Jindal based on the information contained in the disclosed portions of the mental health records. Such a request must be granted, but any cross-examination shall be limited in scope to questions regarding the competency and credibility of the witnesses in light of the contents of the disclosed portions of the medical records. Also, no such cross-examination shall be conducted outside DPW's presence and DPW shall be afforded the opportunity to rehabilitate its witnesses through redirect examination.[11]

The Commission's order is vacated and the case is remanded.

### ORDER

AND NOW, this 31st day of August, 1995, the order of the State Civil Service Commission in the above-captioned matter is vacated and the present matter is remanded for the Commission to allow Dennis K. Johnsonbaugh (Petitioner) to review the portions of Susan R.'s and Lois G.'s mental health records that were released to the Pennsylvania Department of Public Welfare (DPW). Petitioner may request an evidentiary hearing for the purpose of cross-examining Susan R., Lois G., Dr. Edward Coronado and Dr. Inesh Jindal. Such cross-examination shall be limited in scope to questions regarding competency and credibility of witnesses in light of the contents of mental health records. Also, DPW shall be afforded an opportunity to rehabilitate the witnesses at the hearing through redirect examination.

Jurisdiction relinquished.

RODGERS, Senior Judge, dissenting.

I respectfully dissent to the majority's conclusion that Susan R. was competent to testify.

> . . . .
> Mr. Wise: By limiting what she chooses to disclose and not disclose, she is limiting our right of cross-examination unfairly; we are being denied the right of fair cross-examination under the ... United States Constitution, under the Constitution of Pennsylvania. . . .
> N.T. 7/26/93 at 18–19; R.R. at 37a–38a.

---

9. DPW acknowledged that Susan R. "consented to a limited release of information concerning, specifically, the incident in question ..." but that she did not consent "to a release of patient records prior to the incident or after the incident unless they relate to the incident...." N.T. 7/26/93 at 16–17; R.R. at 35a–36a. Additionally, Lois G. testified that she consented to a release of her medical records. N.T. 7/26/93 at 159–160; R.R. at 178a–179a.

10. Wise to the presiding Commissioner, Elizabeth H. Kury:
    Mr. Wise: —let me make another objection. . . .

11. Lastly, Petitioner contends that he was denied a fair hearing before an impartial tribunal. However, the record establishes that the Commission was impartial and unbiased in its handling of this case.

The general rule is that a person with mental illness is competent to testify if she is capable of giving a correct account of matters which she has seen or heard in reference to the questions at issue. *Kakas v. Department of Public Welfare*, 65 Pa.Commonwealth Ct. 550, 442 A.2d 1243 (1982). Testimonial competency also requires minimum mental capacity at the time of the events testified to. *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974). The capacity to communicate, in itself, is meaningless unless it is supported by the capacity to note an occurrence at the time it happened and the ability to remember it. *Id.* Moreover, testimonial competency requires the mental capacity to perceive the event with a substantial degree of accuracy. *Id.*

In *Kakas*, the court stated that there was no indication in the record that the witness in question lacked the mental capacity to "understand the questions, communicate intelligible answers, or recollect the events in issue". *Id.* at 552, 442 A.2d at 1244. The same cannot be said of the record in the present case.

From the beginning of Susan R.'s brief direct examination, her testimony indicated that she was confused, at the very least, regarding the alleged events. For instance, the following exchange ensued:

Q When did you tell a staff member? When was the first time you told someone?

A About what?

Q About what happened, about you going in the elevator with him, and about the recreation room or the storage room?

A Something happened. I don't know what happened, but something must have—

Q Okay. You don't—

A —happened.

N.T. 52.

On cross-examination, the first question posed to Susan R. was regarding the dates the alleged incidents occurred.[1] In response, Susan R. testified as follows:

A It's supposed to have been on the list; so, you're going to have to check in with Jesus and God as to the dates and the time.

Q I'm sorry? I didn't understand what you said.

A Oh—

Q Could you repeat what you said?

A I said, the times and the dates and the minutes, and stuff like that, usually are on the list when I did it.

Q What list are you talking about?

A Well, I sold my soul to the Devil for a list.

N.T. 53.

At this point, DPW's attorney admitted that Susan R. is delusional and will go on about the devil and Jesus Christ. N.T. 54. Susan R. went on to testify that she and Petitioner had sex almost every day. N.T. 65–66.

The Commission relied on the testimony of Dr. Coronado in determining that Susan R. was competent to testify. Dr. Coronado explained that Susan R.'s diagnosis of undifferentiated schizophrenia meant that she can be out of touch with reality and sometimes see and feel things that don't exist.[2] Dr. Coronado spoke to Susan R. once about the alleged incidents and opined that, at that time, her mental state was stable and her memory intact.

Dr. Coronado admitted that Susan R. was capable of lying.[3] Most important, Dr. Coronado agreed that if Susan R. were delusional about having sex with other staff members, it

---

1. As a matter of fundamental fairness, Petitioner was entitled to know the dates the alleged incidents of illicit sex with the patient occurred in order to properly defend himself.

2. The record also reflects that Susan R. had a proclivity for sexual encounters and sexual fantasies, was sexually promiscuous with other pa-

tients, and had propositioned other staff members. N.T. 193–94, 293.

3. Additionally, other witnesses testified that, on several occasions, Susan R. had threatened to do to them what she had done to Petitioner, i.e., that she would cause them to be terminated. N.T. 300–01, 336–37.

is more likely than not that her testimony regarding Petitioner is delusional. N.T. 38.

As the majority notes, Petitioner's former supervisor stated that Susan R. had told him on several occasions that she was carrying his baby. Three other witnesses corroborated this testimony, stating that Susan R. often said that she was carrying other staff members' babies. A competent person would understand that having a baby presupposes engaging in sexual relations (absent medical—or divine—intervention). Thus, while the majority emphasizes that Susan R. did not accuse other staff members of impropriety, her statements that she was carrying their babies evidence a delusional belief that she had sex with them.

When reviewed as a whole, the record does not support the determination by the Commission that Susan R. possessed the mental capacity to understand questions, communicate intelligible answers and accurately recollect events at issue. Accordingly, I would reverse.