**CONSOLIDATION COAL COMPANY,**
**Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (DUES), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 17, 1998.

Decided March 11, 1999.

Carl J. Smith, Jr., Washington, for petitioner.

Joseph S. Hornack, Pittsburgh, for respondent.

Before SMITH, J., FRIEDMAN, J., and RODGERS, Senior Judge.

FRIEDMAN, Judge.

Consolidation Coal Company (Employer) appeals from an order of the Workers' Compensation Appeal Board (WCAB) affirming the decision of a workers' compensation judge (WCJ) to grant workers' compensation benefits to Charles W. Dues, Jr. (Claimant). We affirm.

Claimant has been a coal miner since August 1969. In August 1974, Claimant began working for U.S. Steel at the Dilworth Mine and, in July 1977, was promoted to the position of section foreman. In January 1984,

Employer took over the Dilworth Mine. Claimant continued to work there as a belt foreman, supervising employees on the mine's conveyor belt system; Claimant was the only black supervisor at the mine. (WCJ's Findings of Fact, Nos. 5, 7.)

James Siko was the general mine foreman and one of Claimant's supervisors. In February 1985, Siko screamed at another foreman, "Don't act like a nigger." Claimant heard the statement and rebuked Siko. Siko remarked, "I didn't know you were there." (WCJ's Findings of Fact, Nos. 6, 9.)

Michael O'Donnell, another of Claimant's supervisors, used the term "nigger" in front of other employees and supervisors. He specifically referred to Claimant as "the nigger" and "the big dumb nigger." In February 1985, on at least two occasions, O'Donnell asked Claimant to get him some "black ... (expletive deleted)." In addition, O'Donnell once made a comment about working his employees like "niggers" in front of the other foremen. (WCJ's Findings of Fact, No. 12.)

John Grimm, a shift foreman and another of Claimant's supervisors, used the term "nigger" and referred to Claimant as "you people." In March or April 1985, after a meeting on discrimination led by personnel director Kathleen Thomas, Grimm told Claimant, "Kathleen said we can't make colorless jokes, but we can make colored jokes." Around the same time, Grimm asked Claimant while he was showering, "What are you doing in here with all us white boys? You shouldn't be here." Later, Grimm told Claimant, in front of other supervisors and employees, that he did not like black people and would not do anything for them. In approximately April 1986, when Claimant was discussing the need to perform rock dusting in an area of the mine that was black with coal dust, Grimm told Claimant, "if you can lay your hand down there and still see your hand then it's not too black." (WCJ's Findings of Fact, No. 11.)

From April 1986 until he ceased working in November 1987, Claimant worked regularly as a fire boss despite the fact that his job title was belt foreman. As a fire boss, Claimant supervised no one and worked alone. The physically demanding job re-quired that Claimant run and crawl through dangerous areas of the mine for several hours each day, or sometimes for an entire shift. Some of the areas of the mine had been abandoned, were partially submerged in water and had only a four-foot high roof. From January 1984 until November 1987, no other supervisor or foreman worked as a fire boss on a regular basis. (WCJ's Findings of Fact, No. 8.)

Claimant heard that, at a mine rescue banquet in August 1986, Ed Plisko commented to Thomas, the personnel director, "isn't Charlie really black." Thomas told Plisko to be quiet because Claimant might hear him. (WCJ's Findings of Fact, No. 14.)

Because of these various episodes, Claimant complained to John Toth, superintendent of the mine, on more than one occasion about racial harassment. Thomas conducted an investigation into Claimant's allegations and was able to substantiate many of them. Nevertheless, Employer never disciplined its employees or supervisors in any way. Employer's only action was to hold a series of meetings on discrimination. (WCJ's Findings of Fact, No. 13.)

On November 5, 1987, Claimant's wife telephoned Employer to inform Employer that Claimant had been hospitalized on November 4, 1987 for work-related stress. Claimant returned to work in May 1988 and was assigned the job of fire boss. On October 5, 1988, Claimant was hospitalized at the Chestnut Ridge Psychiatric Hospital because of depression and suicidal tendencies. Claimant returned to work on November 1, 1988 and was assigned the job of fire boss. However, Claimant became light-headed that day and had to leave work. Claimant did not return to work after that. On November 17, 1989, Employer terminated Claimant pursuant to Employer's policy of terminating all employees who have been disabled for more than one year. (WCJ's Findings of Fact, Nos. 15–16, 18, 21(a), 21(c), 21(d), 22.)

On March 14, 1990, Claimant filed a claim petition alleging that he became totally disabled on November 4, 1987 as a result of racial discrimination by his co-workers during his employment with Employer. Em-

ployer filed a timely answer on April 12, 1990.[1] (WCJ's Findings of Fact, Nos. 1–2.)

At a hearing before the WCJ, Claimant presented the deposition testimony of Robert M. D'Alessandri, M.D., Board-certified in internal medicine and infectious diseases. Dr. D'Alessandri testified that he first treated Claimant on November 18, 1980. His diagnosis at that time was sarcoidosis. In treating Claimant, Dr. D'Alessandri noted that Claimant's weight fluctuated because of stress and that his blood pressure was highest when Claimant was most stressed. In 1986, Claimant's physical complaints increased. Claimant and Dr. D'Alessandri discussed racial discrimination at the mine, and the doctor felt that some of Claimant's physical complaints were due to the stress on Claimant caused by the racial discrimination at work. Dr. D'Alessandri referred Claimant to Richard John Seime, Ph.D., a licensed psychologist. On August 2, 1988, Dr. D'Alessandri recommended that Claimant stop working at the mine. (WCJ's Findings of Fact, No. 16.)

In April 1989, Dr. D'Alessandri referred Claimant to Kevin Ashley Halbritter, M.D., Board-certified in internal medicine. Dr. Halbritter testified by deposition that Claimant suffered from sarcoidosis, anxiety, depression, obesity and hypertension, sleep apnea and headaches. Dr. Halbritter was of the opinion that work-related stress was a significant factor in causing Claimant's anxiety and depression. Dr. Halbritter's prognosis for Claimant to return to gainful employment was very poor without a change in work environment. (WCJ's Findings of Fact, No. 17.)

Dr. Seime testified by deposition that he initially diagnosed Claimant as having psychological factors affecting his physical conditions. Dr. Seime's diagnosis at the time of his deposition was that Claimant suffered from major depression, exacerbated by stress from his work. Dr. Seime opined that Claimant could not return to his regular

work but may be able to work in some other setting. (WCJ's Findings of Fact, No. 18.)

In opposition to the claim petition, Employer offered the deposition testimony of Stuart Burstein, M.D., Board-certified in psychiatry. Dr. Burstein saw Claimant on June 16, 1991 at Employer's request. He examined Claimant for approximately three and one-half hours and reviewed Claimant's medical records. Dr. Burstein opined that Claimant had received effective treatment for his psychiatric condition and could return to work. However, Dr. Burstein stated that the racial slurs and harassment at work "added to the woeful feeling [Claimant] had from his depression and would contribute to him feeling worse about things." (WCJ's Findings of Fact, No. 20.)

Employer also presented the Findings of Fact and Conclusions of Law issued on July 26, 1991 in the case of *Dues v. Consolidation Coal Company*, Civil Action No. 87–1895, in the United States District Court for the Western District of Pennsylvania. Claimant had filed the action against Employer for violations of Title VII of the Civil Rights Act of 1964. (R.R. at 44a.) The federal court found that racial harassment at the mine exacerbated Claimant's psychological problems and that, but for the racial harassment, Claimant would have been able to continue working at the mine. The court awarded Claimant back pay but not "front pay."

The Court finds that reinstatement is impractical because the claimant is not physically and psychologically capable of returning to work at [the mine]. Resolution of this law suit would remove any remaining stress and associated physical and psychological problems plaintiff suffers as a result of racial harassment at the mine. However, plaintiff will still be unable to return to work due to his physical ailments[,] particularly his hypoxia. The court finds that plaintiff's future disability is not the result of his harassment at the

---

1. Claimant filed two additional claim petitions on October 8, 1991, each with a different disability date. One claim petition alleged a disability date of October 5, 1988; the other alleged a

disability date of November 1, 1988. Employer filed a timely answer to each of these petitions. (WCJ's Findings of Fact, No. 3.)

mine. Consequently, an award of front pay is not justified.

(WCJ's Findings of Fact, No. 21.)

After considering the evidence, the WCJ concluded that, for the periods from November 4, 1987 through May 10, 1988, October 5, 1988 through October 31, 1988, and November 2, 1988 to the present, Claimant is totally disabled due to work-related stress caused by the abnormal working condition of being exposed to racial harassment. (WCJ's Findings of Fact, No. 23; WCJ's Conclusions of Law, No. 5.) The WCJ also concluded as a matter of law that the doctrine of issue preclusion did not bar Claimant from an award of benefits. The WCJ noted that, although the federal court concluded that racial harassment at the mine would have no adverse effect on Claimant after resolution of the federal lawsuit, there was no medical evidence before the WCJ to that effect. Therefore, the WCJ granted benefits to Claimant for the period from July 27, 1991 until such time as Claimant's condition changes or ceases.[2] Employer filed an appeal with the WCAB, which affirmed the decision of the WCJ.

On appeal to this court,[3] Employer argues that, because of issue preclusion, or collateral estoppel, the WCJ was bound by the federal court's determination with respect to whether Claimant has a continuing work-related disability. We disagree.

The Pennsylvania Supreme Court has defined collateral estoppel, or issue preclusion, as follows:

> [c]ollateral estoppel, or issue preclusion, is a doctrine which prevents re-litigation of an issue in a later action, despite the fact that it is based on a cause of action different from the one previously litigated. The identical issue must have been necessary to final judgment on the merits, and the party against whom the plea is asserted must have been a party, or in privity with a party, to the prior action and must have had a full and fair opportunity to litigate the issue in question.

*Bortz v. Workmen's Compensation Appeal Board (Reznor Division of FL Industries)*, 546 Pa. 77, 81–82, 683 A.2d 259, 261 (1996) (quoting *Balent v. City of Wilkes–Barre*, 542 Pa. 555, 564, 669 A.2d 309, 313 (1995)).

■ This court has explained that the doctrine bars relitigation of an issue in a subsequent action only when: (1) the issue decided in the prior case is identical to the one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the doctrine is asserted was a party or in privity with a party in the prior case and had a full and fair opportunity to litigate the issue; and (4) the determination in the prior proceeding was essential to the judgment. *Pucci v. Workers' Compensation Appeal Board (Woodville State Hospital)*, 707 A.2d 646 (Pa.Cmwlth.1998). We conclude that the issue presented here is *not* identical to the issue decided in the Title VII action.

■ The issue under Claimant's Title VII action was whether the racial discrimination Claimant experienced at the mine would continue to have a significant and adverse effect on his psychological well-being after resolution of the lawsuit and into the future. (U.S. District Court's Conclusions of Law, No. 4; R.R. at 54a.) If so, then Claimant was entitled to "front pay" in order to make him whole. Calculation of "front pay" under Title VII can be speculative because it often requires an estimation of future harm. In Title VII cases, the employer bears the risk of any uncertainty in the calculation of future damages. (U.S. District Court's Conclusions of Law, Nos. 10, 13, 17; R.R. at 57a–58a, 60a.)

The issue before the WCJ, relative to this appeal, was whether Claimant demonstrated by unequivocal medical testimony that the

---

2. The federal court ordered that Claimant was to receive his entire salary from November 4, 1987 through July 26, 1991. (WCJ's Findings of Fact, No. 22.) Thus, Claimant suffered no loss of earnings for that period of time.

3. Our scope of review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Toborkey v. Workmen's Compensation Appeal Board (H.J.Heinz)*, 655 A.2d 636 (Pa.Cmwlth.), *appeal denied*, 541 Pa. 655, 664 A.2d 544 (1995).

racial harassment at the mine continued to disable him after resolution of the federal lawsuit and until the close of the record in the workers' compensation proceeding. If so, then Claimant was entitled to workers' compensation benefits that could be modified, suspended or terminated as Claimant's condition changed. The employer bears no risk of uncertainty with respect to benefits because of the statutory provisions for modification, suspension and termination of benefits.

■ Although the issue presented in Claimant's Title VII action is similar to the issue here, the two are not identical. Indeed, for purposes of issue preclusion, Pennsylvania courts do not find issues to be identical where the policies and procedures of the two legal schemes are different. *Odgers v. Unemployment Compensation Board of Review*, 514 Pa. 378, 525 A.2d 359 (1987); *Verbilla v. Workmen's Compensation Appeal Board (Schuylkill Nursing Association)*, 668 A.2d 601 (Pa.Cmwlth.1995); *Johnsonbaugh v. Department of Public Welfare*, 665 A.2d 20 (Pa.Cmwlth.1995), *aff'd*, 549 Pa. 572, 701 A.2d 1357 (1997). The Third Circuit Court of Appeals has noted that the policies of Title VII and the Pennsylvania workers' compensation law are quite different.

> The policy of Title VII is to achieve equality of employment opportunities and remedy discrimination in the workplace. By contrast, Pennsylvania's workmen's compensation law is designed to define the liability of employers for injuries to employees occurring in the course of employment.

*Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 551 (3d Cir.1996). We agree with the Third Circuit Court of Appeals that the policies of Title VII and the Pennsylvania workers' compensation law are different.

The procedures are also different. For example, in a workers' compensation proceeding, there must be unequivocal medical testimony regarding the continuation of a work-related disability. There is no such burden of proof in a Title VII proceeding in federal court. Indeed, it appears from the record before us that the federal court heard *no medical testimony at all*. Numerous depositions from the federal court proceedings have been entered into the record in this case. However, *none* of them is a medical deposition. Thus, Claimant did not have a full and fair opportunity to convince the federal court with unequivocal medical testimony that he has a continuing disability from past racial discrimination at the mine.[4]

Because the issue previously litigated in federal court is not identical to the issue presented here and because Claimant did not have a fair and full opportunity in federal court to present unequivocal medical testimony regarding Claimant's continuing disability from past racial discrimination at the mine, we conclude that it is inappropriate to apply the doctrine of issue preclusion here. Accordingly, we affirm.

### ORDER

AND NOW, this 11th day of March, 1999, the order of the Workers' Compensation Appeal Board, dated April 17, 1998, is affirmed.

Senior Judge RODGERS dissents.

---

4. We also note that the calculation of "front pay" in a federal Title VII action can require speculation about the extent of future harm to a plaintiff from past discrimination. Thus, the employer bears the risk that the court will award a large amount of money to a plaintiff who may actually suffer *no* future harm from past discrimination. However, in a workers' compensation proceeding, the WCJ only has to determine whether a claimant is disabled at the close of the record in that proceeding. There is no speculation, and the employer bears no risk because the employer can file a petition to suspend, modify or terminate the benefits if the claimant's condition changes.